Murphy J. FOSTER and wife, Olive R. Foster, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 10171.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 18, 1962.

Blanchard, Goldstein, Walker & O'Quin, Thomas A. Harrell, Shreveport, La., Monroe & Lemann, Walter J. Suthon, III, New Orleans, La., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Charles W. Mehaffy, Jerome J. Reso, Jr., Attys., Dept. of Justice, Washington, D. C., Kathleen Ruddell, U. S. Atty., L. Howard McCurdy, Asst. U. S. Atty., New Orleans, La., for the United States.

AINSWORTH, District Judge.

The question for determination is whether the proceeds from the sale of an

oil payment are to be treated as capital gains or ordinary income. The oil payment in question is held to be a retained oil payment, a capital asset, the sale of which results in a capital gain. Also, the oil payment is on nonproducing land and the payment cannot be ascertained with sufficient accuracy to constitute a mere assignment of future income.

Taxpayers, Murphy J. Foster and his wife Olive R. Foster,[1] were owners of an undivided one-tenth (⅒th) interest in Dixie Plantation, a sugar cane plantation. On July 1, 1955, taxpayer and the other landowners executed an oil, gas and mineral lease covering all but eleven acres of the plantation. The lease was for six months (the primary term) and as long thereafter as oil, gas or other minerals were in production. There was a proviso that it would terminate in four months unless the lessee began operations and unless a second well was commenced within three months after completion or abandonment of the first well.

Taxpayer and the other lessors retained what was termed in the lease a "royalty" interest to be paid out of ten twenty-fourths ($^{10}$⁄₂₄ths) of production until $220,000.00 was paid. Thereafter, the lessors were to receive a royalty of five twenty-fourths ($^{5}$⁄₂₄ths) of production.

The same day the lease was executed, taxpayer and the other co-owners of Dixie Plantation sold to parties unrelated to taxpayer what was termed a mineral "royalty" interest of five twenty-fourths ($^{5}$⁄₂₄ths) of production until $110,000.00 was paid. The consideration for this conveyance was $100,882.35.

The taxpayer's one-tenth (⅒th) share of the proceeds from this conveyance was $10,088.23. The taxpayer and his wife reported on their joint income tax return for 1955 this sum, less expenses, as gain from the sale of a capital asset held for over six months. Upon audit of their return the Internal Revenue Service determined that the proceeds from this conveyance were taxable as ordinary income instead of capital gains. The taxpayer maintains his original position and sues for refund of income taxes and interest for the year 1955 in the amount of $1,517.38.

■ Since the sale or exchange of a capital asset will give rise to a capital gain, it is necessary to examine the nature of the interest conveyed in order to determine whether or not it is a capital asset within the meaning of the Act.[2]

---

1. Taxpayer Olive R. Foster is a party to this suit only by reason of the fact that a joint income tax return was filed for 1955. Unless otherwise specifically noted, the term "taxpayer" will refer to Murphy J. Foster.

2. The Internal Revenue Code of 1954, Section 1221, 26 U.S.C.A. § 1221, defines "capital asset" as "property held by the taxpayer. * * *"
   In Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1499, 4 L.Ed.2d 1617 (1960), the Supreme Court said that " * * * not everything which can be called property in the ordinary sense * * * qualifies as a capital asset." Thus, in addition to the statutory exclusions of Section 1221, there are the judicial exclusions based upon the " * * * purpose of Congress [which is] to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time * * *." Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., supra, 134, 80 S.Ct. 1500; Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199 (1932).
   In Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 264, 78 S.Ct. 691, 693, 2 L.Ed.2d 743 (1958), the Supreme Court accepted the premise laid down in the Texas State Court decisions that oil payments are interests in land. In Louisiana an oil payment is certainly a property right. Article 2451 of the Louisiana Civil Code of 1870 provides for the sale of a hope which has been defined as the sale of an expectation dependent upon a chance. The sale of a hope had its origin in the Roman law and was termed *emptio spei*. Its underlying theory was that the seller sold to the buyer the hope that the seller had of acquiring the thing. (See Buckland, A Manual of Roman Private Law (1928), 279, § 107; 2 Planiol, Civil Law Treatise, Nos. 1415–1428.)

The taxpayer as a landowner owned the mineral interests therein.[3] He leased the mineral rights and retained what was termed a "royalty" interest.[4] This retained "royalty" was to be paid out of ten twenty-fourths (10/24ths) of production until $220,000.00 was paid. Thereafter, the taxpayer was to receive a "royalty" of five twenty-fourths (5/24ths) of production. A close analysis of this transaction reveals that the taxpayer actually retained two separate and distinct interests. He retained a royalty interest of five twenty-fourths (5/24ths) and in addition he retained an oil payment of $110,000.00 payable out of a separate five twenty-fourths (5/24ths). The retained oil payment paid out when a total of $220,000.00 or $110,000.00 from each five twenty-fourths (5/24ths) was earned. Thus the five twenty-fourths (5/24ths) royalty was not dependent upon the pay-out of the retained oil payment but was concurrent with it. This has significance since it has been held that the proceeds from the sale of a retained oil payment will be recognized as a capital gain.[5]

3. This is a simplified statement of the property rights involved. Actually, the Civil Code of Louisiana provides for only two kinds of estates in lands: (a) simple ownership of the soil, being the dominion of the soil and all that lies directly above and below it, Article 505, Louisiana Civil Code of 1870; and (b) servitude thereon (including usufruct), being a charge imposed upon the land for the utility of other lands or persons, Articles 533, 646, 647, Louisiana Civil Code of 1870.

The sale or reservation of minerals is the granting or retention of a right to go upon the land to explore it and is classified as a servitude. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1920). More accurately the right to explore is "in the nature of a servitude," and this right may appear in a contract of lease. Arent v. Hunter, 171 La. 1059, 133 So. 157 (1930); Wilcy v. Davis, 164 La. 1090, 115 So. 280 (1928). By application of the prescriptive period of the predial servitude (Article 789, Louisiana Civil Code of 870) to the mineral servitude, the mineral servitude is extinguished by "the non-usage of the same during ten years." Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229 (1930).

4. Although the interest retained by the taxpayer in the instant case was termed a "royalty", however, as stated in Hamme v. Commissioner, 4 Cir., 1953, 209 F.2d 29, 32:

"It is well established, however, that the name used by the parties in describing a contract and payments thereunder, do not necessarily determine the tax consequences of their acts. West v. Commissioner, 5 Cir., 150 F.2d 723; Hogan v. Commissioner, 5 Cir., 141 F.2d 92."

Anderson v. Helvering, 310 U.S. 404, 409, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940), defined a royalty interest as " * * * a right to receive a specified percentage of all oil and gas produced during the term of the lease * * *." and an oil payment as " * * * the right to a specified sum of money, payable out of * * * the oil, or the proceeds received from the sale of such oil, if, as and when produced * * *." The distinction is that a royalty interest lasts during the entire lease while an oil payment may not, dependent upon production and amount of participation therein.

5. "Oil payments may be created in one of two ways. An oil payment is said to be retained if the owner of any interest in an oil or gas property assigns his interest and retains an oil payment, payable out of future production from the property interest assigned. An oil payment is said to be carved out if the owner of any interest in an oil or gas property assigns an oil payment to another person but retains his interest in the property from which the oil payment is assigned. The tax consequences attaching to a retained oil payment do not fall within the anticipation of income theory, * * * " Breeding and Burton, Income Taxation of Oil and Gas Production, (1961), ¶ 6.02. See also Piske, Federal Taxation of Oil and Gas Transactions (1961), ¶ 9.06.

In 1950, the Commissioner officially expressed the opinion that the sale of an oil payment resulted in a capital gain when the seller divests himself of all interest, i. e., the sale of a retained oil payment is the sale of a capital asset. I.T. 4003, 1950–1, 10. The Commissioner stated that a capital gain results when "the assigned in-oil payment right constitutes the entire depletable interest of the assignor in the property or a fraction extending over the entire life of the property."

Witherspoon et ux. v. U. S., U.S.D.C., N.D.Tex., 1956, 52 Am.Fed.Tax R. 1836 (not officially reported), held that when two retained oil payments are running

Therefore, the sale of the retained oil payment by the taxpayer here was the sale of a capital asset, the proceeds of which are subject to capital-gains treatment.[6]

The taxpayer's contention that even if his conveyance was of a carved-out rather than a retained oil payment he is entitled to capital-gains treatment since the oil payment was on nonproducing lands has merit. In the five cases consolidated for hearing in Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691 (1958), all involved instances where the owners of producing oil, gas or sulphur rights assigned or transferred payment rights on producing land. The court stated, "The pay-out of these particular assigned oil payment rights could be ascertained with considerable accuracy." Commissioner of Internal Revenue v. P. G. Lake, Inc., supra, 265, 78 S.Ct. 694.

The accuracy of ascertaining pay-out is significant in determining whether the transaction involves the sale of a capital asset or the assignment of future income. Of course, the sale of any income-producing asset includes the assignment of future income. However, Lake refers to Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940), which explains that there is a difference between the assignment or sale of income which has been earned by the taxpayer and the sale or assignment of a right which may give rise to income.[7]

The pay-out of an oil payment on nonproducing land does not have that degree of accuracy required in Lake to make it the mere assignment of future income. It is quite possible that no income would have ever been produced from this property. The lessee was not obligated to drill any wells. There was no assurance that the well, if drilled, would strike oil. In fact, the second well drilled was a dry hole. Therefore, at the time the taxpayer sold this oil payment its status was not sufficiently determinable to classify it as "future income."

Judgment accordingly.

concurrently the sale of one oil payment is a capital gain.

Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), held that the proceeds from the sale of a carved-out oil payment are ordinary income; however, in a footnote the court quotes apparently with approval the Commissioner's position that the sale of a retained oil payment results in a capital gain.

Estate of O. W. Killam, 33 T.C. 345 (1959), followed Lake, supra, in that the sale of a carved-out oil payment is the transfer of rights to receive future income, the proceeds of which are taxable as ordinary income. However, Killam expressly distinguished itself from Witherspoon in that the two oil payments in Killam were not running concurrently but were in a series with the start of the second dependent upon the pay-out of the first.

The most recent treatment of this issue was Jay H. Floyd, T.C. Memo 1961–56, which followed Killam on the basis that "This exact issue was before us in [Killam] * * *." While the facts as reported in Floyd appear to be distinguishable from Killam, nevertheless the facts in the instant case are distinguishable, if necessary, from Floyd in that the leaseholder's [Floyd] agreement to repurchase portions of the oil payment contingent upon the amount of production is less than a complete divestiture required by the Commissioner, and quoted in Lake.

6. In Commissioner v. Phillips, 4 Cir., 1961, 275 F.2d 33, the Commissioner relied upon Lake and the court stated that " * * * the test * * * is the status * * * at the time the transaction in controversy may have occurred. * * * "

7. In the "is" part of Galvin, The "Ought" and "Is" of Oil-and-Gas Taxation, 73 Harv.L.R. 1441, 1449–1506 (1960), it is stated that "It is understood that the Service continues to recognize certain exceptions in the application of the Lake principle. The production payment which is retained when the larger interest is assigned is not a carved-out interest." If this is not the current status of the "is," then it "ought" to be.