COMMISSIONER OF INTERNAL REVENUE ET AL.
*v.* P. G. LAKE, INC., ET AL.

No. 108.   Argued March 11, 1958.—Decided April 14, 1958.

*John N. Stull* argued the cause for petitioners.   With him on the brief were *Solicitor General Rankin, Assistant Attorney General Rice* and *Melva M. Graney*.

*Harry C. Weeks* and *J. Paul Jackson* argued the cause for respondents. *Mr. Weeks* filed a brief for P. G. Lake, Inc., et al., and *Mr. Jackson* filed a brief for O'Connor et al., respondents.

*Allen E. Pye* filed a brief for Wrather et al., respondents.

*Peter B. Wells* filed a brief for Weed, respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

We have here, consolidated for argument, five cases involving an identical question of law. Four are from the Tax Court whose rulings may be found in 24 T. C. 1016 (the *Lake* case); 24 T. C. 818 (the *Fleming* case); 24 T. C. 1025 (the *Weed* case). (Its findings and opinion in the *Wrather* case are not officially reported.) Those four cases involved income tax deficiencies. The fifth, the *O'Connor* case, is a suit for a refund originating in the District Court. 143 F. Supp. 240. All five are from the same Court of Appeals, 241 F. 2d 71, 65, 78, 84, 69. The cases are here on writs of certiorari which we granted because of the public importance of the question presented. 353 U. S. 982.

The facts of the *Lake* case are closely similar to those in the *Wrather* and *O'Connor* cases. Lake is a corporation engaged in the business of producing oil and gas. It has a seven-eighths working interest [1] in two commercial oil

---

[1] An oil and gas lease ordinarily conveys the entire mineral interest less any royalty interest retained by the lessor. The owner of the lease is said to own the "working interest" because he has the right to develop and produce the minerals.

In *Anderson* v. *Helvering,* 310 U. S. 404, we described an oil payment as "the right to a specified sum of money, payable out of a specified percentage of the oil, or the proceeds received from the sale of such oil, if, as and when produced." *Id.,* at 410. A royalty interest is "a right to receive a specified percentage of all oil and

and gas leases. In 1950 it was indebted to its president in the sum of $600,000 and in consideration of his cancellation of the debt assigned him an oil payment right in the amount of $600,000, plus an amount equal to interest at 3 percent a year on the unpaid balance remaining from month to month, payable out of 25 percent of the oil attributable to the taxpayer's working interest in the two leases. At the time of the assignment it could have been estimated with reasonable accuracy that the assigned oil payment right would pay out in three or more years. It did in fact pay out in a little over three years.

In its 1950 tax return Lake reported the oil payment assignment as a sale of property producing a profit of $600,000 and taxable as a long-term capital gain under § 117 of the Internal Revenue Code of 1939. The Commissioner determined a deficiency, ruling that the purchase price (less deductions not material here) was taxable as ordinary income, subject to depletion. The *Wrather* case has some variations in its facts. In the *O'Connor* case the assignors of the oil payments owned royalty interests [2] rather than working interests. But these differences are not material to the question we have for decision.

The *Weed* case is different only because it involves sulphur rights, rather than oil rights. The taxpayer was the owner of a pooled overriding royalty in a deposit known as Boling Dome.[3] The royalty interest entitled

gas produced" but, unlike the oil payment, is not limited to a specified sum of money. The royalty interest lasts during the entire term of the lease. *Id.*, at 409.

[2] See note 1, *supra*.

[3] Boling Dome is a tract composed of various parcels of land. The owners of the royalty interests in sulphur produced from the separate parcels entered into a pooling agreement by which royalties from sulphur produced anywhere in Boling Dome were distributed pro rata among all the royalty interest holders. In that sense was the interest of each "pooled."

the taxpayer to receive $0.00966133 per long ton of sulphur produced from Boling Dome, irrespective of the market price. Royalty payments were made each month, based on the previous month's production.

In 1947, the taxpayer, in order to obtain a sure source of funds to pay his individual income taxes, agreed with one Munro, his tax advisor, on a sulphur payment assignment. The taxpayer assigned to Munro a sulphur payment totaling $50,000 and consisting of 86.254514 percent of his pooled royalty interest, which represented the royalty interest on 6,000,000 long tons of the estimated remaining 21,000,000 long tons still in place. The purchase price was paid in three installments over a three-year period. Most of the purchase price was borrowed by Munro from a bank with the sulphur payment assignment as security. The assigned sulphur payment right paid out within 28 months. The amounts received by the taxpayer in 1948 and 1949 were returned by him as capital gains. The Commissioner determined that these amounts were taxable as ordinary income, subject to depletion.

The *Fleming* case is a bit more complicated and presents an additional question not in the other cases. Here oil payment assignments were made, not for cash but for real estate. Two transactions are involved. Fleming and others with whom he was associated made oil payment assignments, the rights and interests involved being held by them for productive use in their respective businesses of producing oil. Each oil payment was assigned for an interest in a ranch. Each was in an amount which represented the uncontested fair value of the undivided interest in the ranch received by the assignor, plus an amount equal to the interest per annum on the balance remaining unpaid from time to time. The other transaction consisted of an oil payment assignment by an owner of oil and gas leases, held for productive use in the assignor's business, for the fee simple title to business

real estate.   This oil payment assignment, like the ones mentioned above, was in the amount of the uncontested fair market value of the real estate received, plus interest on the unpaid balance remaining from time to time.

*First*, as to whether the proceeds were taxable as long-term capital gains under § 117 [4] or as ordinary income subject to depletion.   The Court of Appeals started from the premise, laid down in Texas decisions, see especially *Tennant* v. *Dunn*, 130 Tex. 285, 110 S. W. 2d 53, that oil payments are interests in land.   We too proceed on that basis; and yet we conclude that the consideration received for these oil payment rights (and the sulphur payment right) was taxable as ordinary income, subject to depletion.

---

[4] Section 117 (a) (1) provides in relevant part:

"The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in the trade or business of the taxpayer."   53 Stat. 50, as amended, 56 Stat. 846.

Section 117 (a) (4) provides:

"The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income." 53 Stat. 51, as amended, 56 Stat. 843.

Section 117 (b) provides:

"In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months."   56 Stat. 843.

The purpose of § 117 was "to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See *Burnet* v. *Harmel,* 287 U. S. 103, 106. And this exception has always been narrowly construed so as to protect the revenue against artful devices. See *Corn Products Refining Co.* v. *Commissioner,* 350 U. S. 46, 52.

We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. The pay-out of these particular assigned oil payment rights could be ascertained with considerable accuracy. Such are the stipulations, findings, or clear inferences. In the *O'Connor* case, the pay-out of the assigned oil payment right was so assured that the purchaser obtained a $9,990,350 purchase money loan at 3½ percent interest without any security other than a deed of trust of the $10,000,000 oil payment right, he receiving 4 percent from the taxpayer. Only a fraction of the oil or sulphur rights were transferred, the balance being retained.[5] Except in the *Fleming*

---

[5] Until 1946 the Commissioner agreed with the contention of the taxpayers in these cases that the assignment of an oil payment right was productive of a long-term capital gain. In 1946 he changed his mind and ruled that "consideration (not pledged for development) received for the assignment of a short-lived in-oil payment right carved out of any type of depletable interest in oil and gas in place (including a larger in-oil payment right) is ordinary income subject to the depletion allowance in the assignor's hands." G. C. M. 24849, 1946–1 Cum. Bull. 66, 69. This ruling was made applicable "only to such assignments made on or after April 1, 1946," I. T. 3895, 1948–1 Cum. Bull. 39. In 1950 a further ruling was made that represents the present view of the Commissioner. I. T. 4003, 1950–1 Cum. Bull. 10, 11, reads in relevant part as follows:

"After careful study and considerable experience with the application of G. C. M. 24849, *supra,* it is now concluded that there is no

case, which we will discuss later, cash was received which was equal to the amount of the income to accrue during the term of the assignment, the assignee being compensated by interest on his advance. The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.

These arrangements seem to us transparent devices. Their forms do not control. Their essence is deter-

---

legal or practical basis for distinguishing between short-lived and long-lived in-oil payment rights. It is, therefore, the present position of the Bureau that the assignment of any in-oil payment right (not pledged for development), which extends over a period less than the life of the depletable property interest from which it is carved, is essentially the assignment of expected income from such property interest. Therefore, the assignment for a consideration of any such in-oil payment right results in the receipt of ordinary income by the assignor which is taxable to him when received or accrued, depending upon the method of accounting employed by him. Where the assignment of the in-oil payment right is donative, the transaction is considered as an assignment of future income which is taxable to the donor at such time as the income from the assigned payment right arises.

"Notwithstanding the foregoing, G. C. M. 24849, *supra*, and I. T. 3935, *supra*, do not apply where the assigned in-oil payment right constitutes the entire depletable interest of the assignor in the property or a fraction extending over the entire life of the property."

The pre-1946 administrative practice was not reflected in any published ruling or regulation. It therefore will not be presumed to have been known to Congress and incorporated into the law by re-enactment. See *Helvering* v. *N. Y. Trust Co.,* 292 U. S. 455, 467–468. Cf. *United States* v. *Leslie Salt Co.,* 350 U. S. 383, 389–397. Moreover, prior administrative practice is always subject to change "through exercise by the administrative agency of its continuing rule-making power." See *Helvering* v. *Reynolds,* 313 U. S. 428, 432.

mined not by subtleties of draftsmanship but by their total effect. See *Helvering* v. *Clifford,* 309 U. S. 331; *Harrison* v. *Schaffner,* 312 U. S. 579. We have held that if one, entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes taxable income as if he had collected the interest or received the salary and then paid it over. That is the teaching of *Helvering* v. *Horst,* 311 U. S. 112, and *Harrison* v. *Schaffner, supra;* and it is applicable here. As we stated in *Helvering* v. *Horst, supra,* at 117, "The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them." There the taxpayer detached interest coupons from negotiable bonds and presented· them as a gift to his son. The interest when paid was held taxable to the father. Here, even more clearly than there, the taxpayer is converting future income into present income.

*Second,* as to the *Fleming* case. The Court of Appeals in the *Fleming* case held that the transactions were tax-free under § 112 (b)(1) which provides:

"No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or·for investment." 53 Stat. 37.

In the alternative and as a second ground, it held that this case, too, was governed by § 117.

We agree with the Tax Court, 24 T. C. 818, that this is not a tax-free exchange under § 112 (b)(1). Treasury Regulations 111, promulgated under the 1939 Act, provide in § 39.112 (b)(1)–1 as respects the words "like kind," as used in § 112 (b)(1), that "One kind or class of property may not . . . be exchanged for property of a different kind or class." The exchange cannot satisfy that test where the effect under the tax laws is a transfer of future income from oil leases for real estate. As we have seen, these oil payment assignments were merely arrangements for delayed cash payment of the purchase price of real estate, plus interest. Moreover, § 39.112 (a)–1 states that the "underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated." Yet the oil payment assignments were not conversions of capital investments, as we have seen.

*Reversed.*