Lee **TURZILLO** and Lucille Turzillo, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 15764.

United States Court of Appeals Sixth Circuit.

June 18, 1965.

Richard Katcher, Cleveland, Ohio, for petitioners.

Jeanine Jacobs, Dept. of Justice, Washington, D. C., for respondent, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before MILLER and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.

SHACKELFORD MILLER, Jr., Circuit Judge.

The taxpayers, Lee Turzillo (hereinafter referred to as Turzillo) and his wife, Lucille Turzillo, seek a review of the decision of the Tax Court which held that $95,000.00 of a total of $106,233.36, received by Turzillo in a settlement of a law suit for breach of contract, was ordinary income, taxable as such rather than capital gain.

The facts, which are not in dispute, are stated in detail in the Memorandum, Findings of Fact, and Opinion of the Tax Court, reported at T.C. Memo 1963–317, to which reference is made. For the purposes of this opinion, we restate the following.

Turzillo was an employee of the corporation Intrusion-Prepakt, Incorporated, hereinafter referred to as Intrusion, which was engaged in a specialized branch of the concrete and contracting business in Cleveland, Ohio. The company had a substantial growth and expansion of business, and Turzillo by 1950 became Vice-president and Chief Executive Officer. Prior to September 20, 1954, all of Intrusion's outstanding stock was owned by Louis S. Wertz, its president. At that time a reorganization of its capital structure was effected, under which Wertz became the owner of 948 shares of the 980 shares of Class A common stock, which was all of the outstanding Class A stock. Turzillo and another employee (Smith) each became the owners of 10 shares of Class B common stock, which was all of the Class B stock, and for which each paid $10,000.00.

The holders of the majority of the Class B stock had the right to vote separately as a class and to elect not less than two-fifths of the members of the Board of Directors.

On September 21, 1954, five separate contracts were entered into as follows:

(1) An option contract between Intrusion and Wertz wherein Wertz gave to Intrusion during his lifetime or upon his death the first refusal to purchase his shares of Class A stock at $1,000.00 per share less certain distributions. The right to exercise that option lay exclusively with those directors of Intrusion, who were elected by the owners of Class B stock, namely, Turzillo and Smith.

(2) A contract under which Turzillo and Smith gave to Intrusion an option to purchase their Class B stock, upon a price formula set forth therein, at any time during the 12-month period beginning with whichever of the following events was the first to occur.

(a) The day after such shareholder's death.

(b) The date upon which the employment of such shareholder should be terminated by Intrusion for adequate cause; or

(c) The date upon which the employment of such shareholder should be terminated by such shareholder without adequate cause.

(3) A contract between Intrusion and Wertz whereby Intrusion agreed to employ Wertz as an Executive Vice-president for a period of 15 years at a salary of $20,000.00 a year.

(4) A contract under which Intrusion agreed to employ Turzillo as an executive for a period of 15 years at a salary which was later increased to $18,200.00 per year, plus 5 per cent of the net profits of Intrusion above $100,000.00 and

(5) A similar employment contract between Intrusion and Smith.

There was evidence that at the time of the 1954 reorganization Intrusion and its subsidiaries had a value of approximately one million dollars, that the success of Intrusion was due largely to Turzillo's efforts, and that the future for the company was a bright one.

The arrangements did not work out as contemplated. On October 3, 1955, resolutions were adopted by the Board of Directors of Intrusion which removed Turzillo from his position as Executive Vice-president and created the position of General Manager of Field Operations, to which he was assigned. This took from him the authority and duties that he previously exercised and performed as Executive Vice-president. At this same meeting Smith was elected Executive Vice-president. On December 8, 1955, Intrusion fired Turzillo. In a letter dated December 15, 1955, Turzillo wrote Intrusion complaining of the action taken in firing him and stating that it was Intrusion and not Turzillo that breached the employment contract. Turzillo further complained that as a result of Intrusion's action he was deprived of his contractural rights to become a half owner of Intrusion through his ownership of one-half of the Class B stock and the option in the company to buy from Wertz all of the Class A stock.

Upon being discharged by Intrusion, Turzillo organized a competing business, the Lee Turzillo Contracting Company, which was successfully operated. In May 1957 Turzillo also organized the Masonry Equipment & Supply Co., which was engaged in the leasing of construction equipment and supplies. Subsequent to 1956 Turzillo's income from these businesses was in excess of that received as compensation from Intrusion in 1955.

In February 1956 Turzillo brought suit in the Court of Common Pleas, Cuyahoga County, Ohio, against Intrusion and its directors.

The amended petition in this suit set out four alleged causes of action, as follows: (1) Termination by Intrusion without adequate cause of its employment contract with Turzillo, which made it impossible for Turzillo to become a half-owner of Intrusion through the retirement of all of the Class A stock owned by Wertz, which would leave the Class B stock, of which he owned one-half, as the only outstanding shares of the corporation. It alleged that this contract offered unlimited possibilities for profit and constituted an asset to him of a value of not less than one million dollars; (2) that an accounting be had to determine five per cent of the corporation's net profits for the period up to the time the corporation discharged him from its employ, alleged by the plaintiff to exceed the sum of $15,000.00; (3) that the defendants be enjoined from impeding plaintiff's business operations by asserting alleged rights which they did not possess and by asserting falsehoods concerning plaintiff and his business; and (4) that the defendants be enjoined from asserting a claim for specific performance under the option agreement relating to plaintiff's shares of Class B stock.

Intrusion by its answer and counterclaim denied the material allegations of the amended petition and alleged affirmatively that its discharge of Turzillo on December 8, 1955, was for adequate cause, that Turzillo in his organization and operation of Lee Turzillo Contracting Company was illegally utilizing trade secrets of Intrusion, knowledge of which he had acquired while in the employ of Intrusion, and that it had notified Turzillo of the exercise by it of its option to purchase Turzillo's Class B stock, but that Turzillo had refused to deliver the stock to Intrusion in accordance with the option agreement. It sought specific performance of its option to purchase Turzillo's Class B stock, that Turzillo be enjoined for a period of five years from engaging in any business competitive with that of Intrusion and from using or permitting the use by others in perpetuity of any invention or trade secret of Intrusion, and for judgment in the amount of $100,000.00.

In April 1956 Intrusion filed an action in the United States District Court for the Northern District of Ohio, Eastern

Division, against Turzillo and Lee Turzillo Contracting Company seeking to enforce its option to purchase Turzillo's Class B stock, together with other relief, in which Turzillo filed an answer and cross-complaint seeking substantially the same relief sought in his amended petition filed in the Court of Common Pleas of Cuyahoga County, Ohio.

Following negotiations between the attorneys for the respective parties, Turzillo's attorney advised Intrusion's attorney by letter of February 19, 1958, that he was authorized to offer in full settlement of all controversies between the parties, to be accompanied by an exchange of mutual releases by which each of them would fully and completely release the others from all claims of every kind and character, the sum of $11,233.36 for the purchase of Turzillo's Class B stock at the option price of that amount, and to pay to Turzillo the sum of $95,000.00 in settlement of all of his claims to continued employment by it. By letter of February 24, 1958, Intrusion's attorney advised Turzillo's attorney that he was authorized to accept the terms of the offer. On April 3, 1958, Turzillo and the Lee Turzillo Contracting Company executed a release which provided that in consideration of the sum of $95,000.00 Turzillo released Intrusion and its directors "from any and all claims of every kind and character whatsoever which he now has or may hereafter make or assert against them or any of them for, on account of, or in any manner connected with or arising out of any matter or thing to this date occurring, including but not by this enumeration limited to, all claims and demands asserted by the undersigned Lee Turzillo" in the action filed by him in the Court of Common Pleas, Cuyahoga County, Ohio; all claims asserted in the cross-complaint filed by Lee Turzillo and Lee Turzillo Contracting Co. in a case pending in the United States District Court for the Northern District of Ohio, in which Intrusion was plaintiff and Lee Turzillo and Lee Turzillo Contracting Company were defendants; "and all claims of every kind and character whatsoever arising out of or in any manner connected with the employment of Lee Turzillo by Intrusion-Prepakt, Incorporated, and the termination of such employment, any right or claim of right to the continuance of such employment, whether by contract or otherwise." At the closing of the settlement when this release was given, two checks, one in the amount of $11,233.36 and the other in the amount of $95,000.00, were handed to Turzillo and Turzillo handed to representatives of Intrusion his certificate of stock endorsed in blank.

Turzillo and his wife on their income tax return for the calendar year 1958 reported as long-term gain from the sale or exchange of capital assets an amount of $86,983.36, which amount was arrived at by showing a gross sales price of $106,233.36 reduced by the amount of $19,250.00 consisting of costs or other basis of $10,000.00 of the Class B stock and expenses of sale of $9,250.00. The Commissioner held that the sale effected was separable into two parts, (1) the sale of Turzillo's Class B stock for $11,233.36, and (2) payment of $95,000.00 for cancellation of Turzillo's employment rights in Intrusion, which $95,000.00 was held to constitute ordinary income for the reason that it was a substitute for compensation for services. Following a deficiency assessment by the Commissioner, the Tax Court sustained the Commissioner's theory of the settlement and held there was a deficiency in the income tax of Turzillo and his wife for the taxable year 1958 in the amount of $35,300.02. The taxpayers thereafter filed the present petition for review of the decision of the Tax Court.

The parties are in agreement that the classification of amounts received in settlement of a law suit as between ordinary income and capital gain is determined by the nature of the litigation with respect to which the payment in settlement is made. Farmers' & Merchants' Bank v. Commissioner of Internal Revenue, 59 F.2d 912, C.A.6th; Raytheon Production Corp. v. Commissioner of Internal Revenue, 1 T.C. 952, affirmed, 144 F.2d 110,

C.A.1st, cert. denied, 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622.

The Tax Court was of the opinion that Turzillo's right to acquire a one-half interest in Intrusion would accrue to him only through his continued employment by Intrusion until certain contingencies occurred, in that upon the termination of his employment Intrusion would exercise its option to buy his Class B stock, which would terminate any interest he had or the right to acquire in the company. Accordingly, the payment of $95,000.00 to him in addition to the $11,233.36 paid him for his Class B stock was in substance payment for the loss of future salary under his contract of employment, which was ordinary income rather than capital gain. If this analysis of Turzillo's claim is correct, the ruling based upon it would also be correct. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743, rehearing denied, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071.

On this review Turzillo strenuously challenges this construction of the contracts and contends that his rights under the contracts were not dependent upon his continued employment by Intrusion. We are of the opinion that this contention is sound. Turzillo's ownerhip of his Class B stock would have continued if his employment were terminated by Intrusion without cause or if he left the corporation with cause. The option in Intrusion to purchase Turzillo's Class B stock did not apply to either of these situations, the first of which is the situation claimed by Turzillo to exist in the present case. Commissioner's brief concedes that this construction of the contracts is correct and he does not attempt to sustain the Tax Court's decision on that ground.

Commissioner's contention is that although a contract right is a property right, it is not the law that any property right, not excluded in the statutory definition of a capital asset, is automatically a capital asset within the meaning of the statute giving preferential tax treatment to the gain resulting from the sale or exchange of a capital asset. Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134–135, 80 S.Ct. 1497, 4 L.Ed.2d 1617; Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 31, 61 S.Ct. 757, 85 L. Ed. 1168; Commissioner of Internal Revenue, v. P. G. Lake, Inc., supra, 356 U.S. 260, 264–265, 78 S.Ct. 691, 2 L.Ed.2d 743, rehearing denied, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071. See: Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29, rehearing denied, 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 823; Shuster v. Helvering, 121 F.2d 643, 645, C.A.2nd. Proceeding on that basis, the Commissioner argues that although the contract rights which Turzillo owned were property rights, they were not the type of property rights which the statute intended should receive capital gains treatment.

Just what property rights qualify for capital gains treatment and what property rights do not so qualify appears to be a close and difficult question. See opinion of Judge Friendly in Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125, C.A.2nd, with cases cited therein.

The Commissioner relies strongly upon the fact that the right of Turzillo to acquire over a period of time half ownership of Intrusion by reason of his contract is so dependent upon a number of contingencies not subject to the control of Turzillo as to eliminate it from the classification of a capital asset. The continued successful operation of the company is a matter of major consideration in that the company might not be in a financial condition to purchase Wertz's Class A stock at the option price after a period of a few years might be too high to justify a purchase at that price. Also, the decision to purchase Wertz's Class A stock rested with Turzillo and Smith jointly, not with Turzillo alone, and the two of them might not be in agreement about the advisability of making such a purchase even if the company was financially able to do so and

the option price was a satisfactory one. And, of course, the exercise by Intrusion of its option to buy Turzillo's Class B stock upon the happening of certain events would eliminate Turzillo from the picture. We believe, however, that these uncertainties and contingencies do not affect the existence of Turzillo's contract rights, which quite possibly could result in the acquisition by Turzillo of a half interest in the company, but that they pertain to the value of such contract rights in the light of such uncertainties. We are not here concerned with the value of such rights which the parties themselves have agreed upon in the settlement of the litigation.

Questions similar to the one here presented have had the consideration of the Ninth and Second Circuits in Dorman v. United States, 296 F.2d 27, 29–30, C. A.9th, and Commissioner of Internal Revenue v. Ferrer, supra, 304 F.2d 125, C.A.2nd, with rulings favorable to the taxpayer. See also: Commissioner of Internal Revenue v. Goff, 212 F.2d 875, 876, C.A.3rd, cert. denied, 348 U.S. 829, 75 S.Ct. 52, 99 L.Ed. 654; Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 210 F.2d 752, 753, C.A. 2nd, cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Commissioner of Internal Revenue v. Golonsky, 200 F.2d 72, C.A.3rd, cert. denied, 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366; Commissioner of Internal Revenue v. Ray, 210 F.2d 390, C.A.5th, cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Levenson v. United States, 157 F.Supp. 244, 249, N.D. Ala.

█ In line with the above rulings we are of the opinion that the rights acquired by Turzillo through the execution of the five contracts on September 21, 1954, were property rights, the essential nature of which was not merely to obtain periodic receipts of income for services rendered, but to afford Turzillo an opportunity to acquire an interest in property, which if itself held, would be a capital asset. Commissioner of Internal Revenue v. Ferrer, supra, 304 F.2d 125, 130–131, C.A.2nd. It will be no-

ticed that Turzillo's amended petition did not seek recovery of future income from any loss of employment, but sought damages for the illegal termination by Intrusion of Turzillo's option to acquire an interest in the company. Accordingly, we consider these contract rights to be a capital asset.

██ We do not think that it is of any material significance that in negotiating for a settlement of the pending litigation and in executing the release the parties included in the settlement a release by Turzillo of "all claims of every kind and character whatsoever arising out of * * *" the employment of Turzillo, the termination of such employment and any claim to the continuance of such employment. The parties were looking to a release of any and all possible claims that Turzillo might have, even though no recovery was sought for them in the amended petition. It was normal, careful representation of a client to make the release as broad as possible, even though at that time no such claim was being made. We still must look for what was the money paid. See: Goldsmith v. Commissioner of Internal Revenue, 22 T.C. 1137, 1144; Estate of Longino v. Commissioner of Internal Revenue, 32 T.C. 904, 906. As a practical matter any claim for future services under the contract of employment was of little, if any, value. There was a duty upon the part of Turzillo to minimize his damages suffered through loss of employment. This he was doing through his successful operation of another business with apparently no net loss resulting from his loss of employment by Intrusion.

█ If it is contended by the Commissioner that in view of the wording of the letters written looking to a possible settlement and the wording of the release itself, at least some part of the amount paid was paid for loss of employment, this would require an allocation by the Tax Court. Commissioner of Internal Revenue v. Ferrer, supra, 304 F.2d 125, 135, C.A.2nd; Ditmars v. Commissioner of Internal Revenue, 302

F.2d 481, 488, C.A.2nd. In the absence of such an allocation, the assessment can not stand. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

The Commissioner further contends that although the contract rights of Turzillo may constitute a capital asset, the settlement of the litigation did not constitute a "sale or exchange" of a capital asset, as is required by Section 117(a) (4), Internal Revenue Code of 1939, or by Section 1222(3) of the Internal Revenue Code of 1954 in order to qualify for special treatment as a long-term capital gain. The basis of this contention is that a sale or exchange involves a transfer of property in goods and that a release of a claim is merely an extinguishment of the claim, not a sale or exchange of property. Numerous authorities are cited in support of this contention, including Hort v. Commissioner of Internal Revenue, 39 B.T.A. 922, 926, affirmed, 112 F.2d 167, C.A.2nd, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Leh v. Commissioner of Internal Revenue, 260 F.2d 489, C.A.9th; General Artists Corp. v. Commissioner of Internal Revenue, 205 F.2d 360, C.A.2nd, cert. denied, 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376.

However, as pointed out in Commissioner of Internal Revenue v. Ferrer, supra, 304 F.2d 125, 131, C.A.2nd, this "formalistic distinction" between a sale to a third person that keeps the property right alive and a release that results in its extinguishment has taxwise little, if any, merit. The Court there said: "Tax law is concerned with the substance, here the voluntary passing of 'property' rights allegedly constituting 'capital assets,' not with whether they are passed to a stranger or to a person already having a larger 'estate.'" Other cases to the same effect are Commissioner of Internal Revenue v. Golonsky, supra, 200 F.2d 72, 74, C.A.3rd, cert. denied, 345 U.S. 939, 73 S.Ct. 830, 97 L. Ed. 1366; Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., supra, 210 F.2d 752, C.A.2nd, cert.

denied, 348 U.S. 829, 75 S.Ct. 53, 99 L. Ed. 654; Commissioner of Internal Revenue v. Ray, supra, 210 F.2d 390, C.A. 5th, cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Metropolitan Building Co. v. Commissioner of Internal Revenue, 282 F.2d 592, C.A.9th; Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929, 935–936, C.A.5th; Dorman v. United States, supra, 296 F.2d 27, C.A.9th. We are of the opinion that the settlement and release in the present case constituted a sale or exchange within the meaning of the statute.

The decision of the Tax Court is reversed and the case remanded for further proceedings consistent with the views expressed herein.