Herbert B. CLINE, Jr., and Brisy Cline, John C. Cline and Mildred Cline, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 77-1754, 77-1755.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1980.

Decided March 25, 1980.

Leon K. Oxley, Frazier & Oxley, Huntington, W. Va., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Division, U. S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Michael L. Paup, Stuart E. Seigel, Chief Counsel, I. R. S., Michael L. Paup, Gayle P. Miller, Aaron P. Rosenfeld, Washington, D. C., for respondent-appellee.

Before LIVELY, BROWN and KENNEDY, Circuit Judges.

LIVELY, Circuit Judge.

The question in this case is whether certain payments received by the taxpayers in the years 1967–1971 were entitled to be treated as long term capital gains, as reported by them, or as ordinary income as contended by the Commissioner. The facts in the two cases are identical, and the cases were consolidated in the Tax Court and in this court. The decision of the Tax Court is reported at 67 T.C. 889 (1977). The stipulated facts are set forth in detail in the opinion of the Tax Court and will be summarized here.

Prior to December 30, 1966 the taxpayers Herbert B. Cline and John C. Cline [1] each owned one-third of the outstanding stock of Wolf Creek Colleries Company (Wolf Creek) and both were active in its operation. On February 1, 1966 the taxpayers entered into a contract with Wolf Creek by which they were to be paid, beginning January 1, 1967, seven cents (3½ cents each) per ton of coal "mined from all leasehold estates of Wolf Creek which shall be acquired by virtue of lease negotiations carried out and accomplished by the Clines on Wolf Creek's behalf, . . . ." The contract contained numerous references to special efforts and valuable services of the Clines, particularly in connection with the procurement of coal leases for Wolf Creek.

Between February and December 1966 the taxpayers obtained two desirable coal leases on behalf of Wolf Creek. Effective December 30, 1966 the taxpayers sold all of their stock in Wolf Creek to a newly formed corporation and withdrew from the management of its affairs. Also on December 30, 1966 the taxpayers and Wolf Creek executed an "indenture" by which the taxpayers purported to sell to Wolf Creek all of their interest in "coal leases, and leasehold estates in coal in place, held by Wolf Creek" and identified in the February 1, 1966 contract. The recited consideration for this "sale and conveyance" was an obligation by Wolf Creek to pay to the Clines a "tonnage royalty" of five cents (2½ cents each) for each ton of coal thereafter loaded or processed through Wolf Creek's loading docks or tippling facilities for sale on the open market. The effect of the December 30, 1966 agreement was to require Wolf Creek to pay the taxpayers five cents per ton for all coal mined or processed by Wolf Creek rather than seven cents per ton for all coal mined by Wolf Creek from leases procured by the Clines.

Contending that the December 1 agreement effected a sale of interest in coal acquired by them under the February 1 contract, the taxpayers reported each year's receipts from Wolf Creek as long term capital gains, pursuant to Section 631(c) of the Internal Revenue Code.[2] The Commissioner denied capital gains treatment and assessed deficiencies on the basis of computations which treated the payments under the December 30 contract as ordinary income. The taxpayers petitioned the Tax Court for redetermination of the deficiencies asserted by the Commissioner.

The majority opinion of the Tax Court found that the transaction evidenced by the December 30 agreement did not constitute a disposal of coal with a retained economic interest as required for Section 631(c) treatment. However, the majority found that the transaction constituted an exchange of

---

1. Brisy Cline and Mildred Cline, the respective wives of Herbert B. Cline and John C. Cline, are parties because they filed joint income tax returns with their husbands for the years in suit. References to the taxpayers in this opinion are to the husbands.

2. I.R.C. § 631(c), 26 U.S.C. § 631(c), provides in part:

    **(c) Disposal of coal or domestic iron ore with a retained economic interest.**—In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore.

the economic interest in coal leases acquired under the February 1 contract for a payment to be measured by the amount of coal handled by Wolf Creek. Reasoning that there had been a sale or exchange of rights acquired under the February 1 contract, the majority concluded that capital gains treatment was required, stating, "It is axiomatic that the royalty interest constitutes a capital asset in the hands of its owners." Nevertheless, since the two leases in which the taxpayers were found to have royalty interests were acquired less than six months before their "sale or exchange" on December 30, the majority opinion found that the payments in question represented short term, rather than long term, capital gains.

Judge Tannenwald, joined by three other members of the Tax Court dissented on two bases. First, the dissenters concluded that the "tonnage royalty" payments were nothing more than compensation for services, and therefore were ordinary income. These royalties were merely a substitute for the rights created by the February 1 agreement. The fact that these rights were "property" does not necessarily mean that they were capital assets for the purpose of determining the proper tax treatment of payments derived from them. Further, even if the right to royalty payments under the February 1 agreement were properly

treated as capital assets, the dissenters concluded that there was no sale or exchange on December 30, 1966. At most the December 30 agreement constituted a modification of the February 1 agreement by substituting a different measure of payment.

For the reasons hereafter set forth we hold that the payments which the taxpayers received pursuant to the December 30 agreement were ordinary income. Though the Internal Revenue Code[3] defines "capital asset" as property held by a taxpayer, with certain exceptions, it has long been held that it is not necessary for a property transaction to come within the literal language of the exclusions contained in the definition in order to be denied capital gains treatment. *Corn Products Co. v. Commissioner*, 350 U.S. 46, 51–52, 76 S.Ct. 20, 23–24, 100 L.Ed. 29 (1955). The Supreme Court has always construed the term "capital assets" narrowly. *Id.* at 52, 76 S.Ct. at 24.

Since "property" and "capital" are not necessarily synonymous, payments received from cancellation of a lease, concededly "property," which were in fact substitutes for rental income were treated by the Supreme Court as ordinary income in *Hort v. Commissioner*, 313 U.S. 28, 31, 61 S.Ct. 757, 758, 85 L.Ed. 1168 (1941). Similarly, the Court refused to accord capital gains treat-

---

**3.** I.R.C. § 1221, 26 U.S.C. § 1221, contains the following definition:

§ 1221. **Capital asset defined**

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or

(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

ment to an award by a claims commission to a company whose assets were temporarily seized by the government during war time. *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). Noting that the fact the receipts were derived from "property" is not controlling, the Court found that the award was based on the fair rental value of the property during the period of government ownership, and was ordinary income. The Court repeated its earlier admonition on the need to construe the term "capital asset" narrowly. 364 U.S. at 134, 80 S.Ct. at 1500. In *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1950), the Supreme Court held that amounts received by taxpayers as consideration for oil payment rights were ordinary income. The Court found that certain lump sum payments were "essentially a substitute for what would otherwise be received at a future time as ordinary income." 356 U.S. at 265.

■ The essential teaching of the cited Supreme Court decisions is that courts must look to the substance, rather than the form, of transactions to determine whether payments to a taxpayer constitute capital gain or ordinary income. The December 30 agreement in the present case was written to reflect a "sale or conveyance" of rights acquired under the February 1 contract. Nevertheless, the substance of the transaction was nothing more than a change in the basis of payments to be made in the future under the February 1 contract. Since the February 1 contract emphasized that its purpose was to provide compensation to the taxpayers for their valuable services to Wolf Creek, all deferred payments under that agreement would have been taxed as ordinary income, the same as any other payments for personal services or labor. Restating the method and basis of computing future payments had no effect on the tax treatment to be accorded the payments when actually received; they remained payments for services.

This court and other courts of appeals have consistently construed the capital gains provisions of the Internal Revenue Code narrowly and have given effect to the substance of transactions. *E. g., Omer v. United States*, 329 F.2d 393, 395 (6th Cir. 1964); *United States v. Frazell*, 335 F.2d 487 (5th Cir. 1964), *cert. denied*, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965); *Commissioner v. Ferrer*, 304 F.2d 125 (2d Cir. 1962). The taxpayers in the present case have relied particularly on this court's decision in *Turzillo v. Commissioner*, 346 F.2d 884 (6th Cir. 1965). While the taxpayer prevailed in *Turzillo*, this result was reached after the court examined five contracts between him and his employer and concluded that, in substance, a transaction by which he received payment for relinquishing all rights under the contracts involved property rights "the essential nature of which was not merely to obtain periodic receipts of income for services rendered, but to afford Turzillo an opportunity to acquire an interest in property, which, if itself held, would be a capital asset." 346 F.2d at 889. The guiding principle, as stated by Judge Shackelford Miller, is: "We still must look for what was the money paid." *Id.*

Looking for what the money was paid in the present case produces a clear answer. It was paid for services rendered to Wolf Creek by the Clines in negotiating coal leases for the company. Since the essential nature of the payments was compensation for services, the Commissioner correctly treated the amounts received by the taxpayers as ordinary income.

■ Though we have reached a conclusion which is different from that of the majority of the Tax Court, there is no necessity for a remand. The parties stipulated that if the court should determine that the payments were ordinary income rather than capital gains, "the adjustments made in the notices of deficiency are correct." The decisions of the Tax Court from which these appeals were taken are based on these deficiency notices.

The decision of the Tax Court in each case is affirmed.