Charles F. RUPPRECHT and Margaret Rupprecht; John D. Hartigan and Nancy Hartigan; Bernard P. Lauber and M. Virginia Lauber; and Putnam L. Crafts, Jr., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 86–84T to 88–84T and 167–84T.

United States Claims Court.

Feb. 20, 1987.

Jon T. Flask, Washington, D.C., for plaintiffs; Grossman & Flask, P.C., Washington, D.C., and Charles F. Rupprecht, Gladstone, N.J., of counsel.

Neil V. Birkhoff, Washington, D.C., with whom was Asst. Atty. Gen. Roger M. Olsen, for defendant; Mildred L. Seidman and George L. Hastings, Jr., of counsel.

## OPINION

MAYER, Judge.

Plaintiffs claim they have overpaid federal income taxes on money they received in exchange for certain unexercised stock options. No facts are in dispute and the case is before the court on cross-motions for summary judgment.

### Background

Plaintiffs Charles F. Rupprecht, John D. Hartigan, Bernard P. Lauber, and Putnam L. Crafts, Jr.,[1] are former officers and employees of Studebaker-Worthington, Inc. (SWI). Under two different incentive stock option plans available to key executives of SWI, they received non-qualified stock op-

---

1. Margaret Rupprecht, Nancy I. Hartigan, and M. Virginia Lauber are parties in Nos. 86–84T, 87–84T, and 88–84T, respectively, because they filed joint federal income tax returns with their husbands for the years at issue. For convenience, the word plaintiffs refers only to their husbands.

tions[2] to purchase shares of SWI stock at their fair market value on the date the options were granted. When the options were granted, they were restricted and not actively traded on an established market. As a result, they did not have a readily ascertainable fair market value within the meaning of section 83(e) of the Internal Revenue Code of 1954, as amended (I.R.C.), 26 U.S.C. § 83(e).

In 1979 McGraw-Edison Co. (McGraw), a Delaware corporation, decided to acquire SWI by obtaining its entire equity interest. SWI then had outstanding approximately 14 million shares of its common stock, and non-qualified options to buy approximately 900,000 additional SWI shares. In August of 1979, a McGraw subsidiary initiated a cash tender offer for all outstanding SWI shares. In September the subsidiary ended its tender offer and became the owner of approximately 93 percent of the stock. Using an expedited Delaware merger procedure, McGraw, through its subsidiary, subsequently obtained the remaining SWI shares.

For McGraw to secure the entire equity interest in SWI, however, it also had to acquire the outstanding SWI stock options. To assure that the services of Derald H. Ruttenberg, SWI's chief executive officer, would be available to McGraw after the merger, McGraw allowed him to exchange his SWI stock options for equivalent McGraw options. Ruttenberg, who agreed to become a member of McGraw's board of directors and provide executive and consulting services for at least five years, was also guaranteed an annual salary of at least $200,000. This, however, still left outstanding matured and unmatured stock options (the "Non-Ruttenberg options") which entitled their owners to purchase 681,160 SWI shares, representing more than 4 percent of SWI's common stock.

Because McGraw wanted to be the sole owner of SWI, it negotiated with the holders to buy all of the Non-Ruttenberg options, both matured and unmatured, for cash. Plaintiffs held the options to approximately 142,450 of the 681,160 SWI shares available through these remaining options. It was agreed that the Non-Ruttenberg options would be surrendered for cash to be provided by McGraw and delivered through SWI or its subsidiaries. Payment for plaintiff Crafts' options came directly from McGraw; the other plaintiffs' payments were delivered through SWI or its subsidiaries. In the course of those proceedings, McGraw never discussed past or future performance of services with any SWI employees, including plaintiffs, except for Ruttenberg.

The payments received by plaintiffs for their unexercised options were taxed as ordinary income. Plaintiffs assert they should have been taxed at capital gain rates. Defendant responds that the payments were properly treated as ordinary income and that section 83[3] controls.

### Discussion

### I

Section 83 governs the taxation of non-qualified stock options issued as compensation for the performance of services after June 30, 1969. In pertinent part, it provides:

(a) *General Rule.*—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property ..., over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services....

---

2. The options are "non-qualified" because they do not meet the requirements for the favorable tax treatment of section 421, incorporating sections 422, 423, and 424 of the Internal Revenue Code of 1954, as amended, 26 U.S.C. §§ 421, 422, 423, 424.

3. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended.

For section 83 to apply to these stock options, section 421 must not apply, I.R.C. § 83(e)(1); see n. 2, *supra,* and the options must have been transferred "in connection with the performance of services." *See Bagley v. Commissioner,* 85 T.C. 663, 669 (1985), *aff'd,* 806 F.2d 169 (8th Cir.1986). The parties stipulate that section 421 does not apply here, so only the service connection is at issue.

Whether property has been transferred in connection with the performance of services is "essentially a question of fact." *Bagley,* 85 T.C. at 669. *Cf.* Treas.Reg. § 1.83–3(f). In concluding that the option there was compensatory, *Bagley* observed that it was granted to a "key employee," the purposes of the option were to "assist [the corporation] in retaining the services of its executives and key employees and to offer such personnel additional incentives to put forth maximum efforts for the success of the business," and that the "sole consideration" furnished to the corporation was the employee's "promise to render services as an employee." 85 T.C. at 670. Although two separate incentive stock option plans are involved, our facts are similar.

The purpose of the first plan was to "provide additional incentive to key executive personnel ... and, by encouraging stock ownership, to increase their proprietary interest in the success of [SWI] by providing them with a more direct interest in the welfare and success of the enterprise." The consideration given by the optionees was an agreement to remain in the employment of SWI (or one of its subsidiaries) for at least two years from the date of the grant. Except under rare circumstances, the option could not be exercised unless the optionee was then employed by SWI. The option could not ordinarily be exercised prior to 36 months from the date of the grant. In determining which key executives should receive options, when the options would be granted, and the number of shares subject to the options, SWI was permitted to "take into account the nature of the services rendered by the respective

employees, [and] their present and potential contributions to the success of [SWI]."

The purpose of the second plan was to "enable Key Executives to acquire ownership interests in SWI on a basis that will encourage them to remain in the Company's employ and use their best efforts to promote its growth and profitability." Once again the optionee had to agree to remain for two years. And in deciding which key executives should receive options, when they would be granted, and the number of shares covered, SWI was permitted to consider the key executives' "present and potential contributions to [SWI's] success."

■ In the context of a stock option plan, the Supreme Court said, "When assets are transferred by an employer to an employee to secure better services they are plainly compensation." *Commissioner v. LoBue,* 351 U.S. 243, 247, 76 S.Ct. 800, 803, 100 L.Ed. 1142 (1956). Because SWI's goal in granting the stock options was to secure the services of its employees, they were granted "in connection with the performance of services" within the contemplation of section 83.

But plaintiffs object that the payments they received for their options came from McGraw, a company for which they never performed any services; indeed, they never even discussed employment with McGraw. As a result, they argue, section 83 is not applicable. They say the tax treatment of the money received should be determined by analysis of the reasons McGraw made payment in the sales transaction and not the reasons for which plaintiffs originally received the options. If the payment was made to "squeeze out the optionee's equity interest in the corporation," plaintiffs argue, "then section 83 does not apply and the payment has to be treated as capital gain." For these propositions, they rely on *Turzillo v. Commissioner,* 346 F.2d 884 (6th Cir.1965), and *Denison v. Commissioner,* 46 T.C.M. (P–H) ¶ 77,430 (1977).

In *Turzillo,* the taxpayer and his employer entered into several contracts which covered, *inter alia,* his future employment

and his right as a stockholder to acquire additional control of the company. 346 F.2d at 885. He was subsequently fired, and brought suit against his former employer for breach of the contracts. The parties settled the case, and the taxpayer received $95,000 for the release of all his claims under the contracts. In the context of rebutting the Commissioner's argument that the $95,000 was paid for the employment rights of the taxpayer, the court said one "must look for what was the money paid." *Id.* at 889. It concluded it was paid for the taxpayer's right to acquire additional control of the company which was not contingent on his continued employment, *id.* at 888, and held the money was therefore taxable as capital gain. *Turzillo* did not involve an employee stock option plan and occurred before enactment of section 83.

■ Contrary to plaintiffs' view, *Turzillo* did not find the employer's reasons for making the settlement payment dispositive. It determined that because the taxpayer was compensated for his right as a stockholder to acquire an interest in the company, and not for loss of employment, he was paid for a capital asset. The court was persuaded by the reason for which the taxpayer originally received the option contract. *Id.* at 889. This line of reasoning was followed in *Bagley*, where, in construing section 83, the court analyzed the employer's "intent in granting the option," 85 T.C. at 670, and in *Rank v. United States*, 345 F.2d 337, 343 (5th Cir.1965), where the court said, "Since it was the purpose to *compensate* at the time the options were granted, it matters not what the motive was for putting an end to those options." *See Kunsman v. Commissioner*, 49 T.C. 62, 71 (1967). Accordingly, the purpose of McGraw, the purchaser of the stock options, has no effect on the applicability of section 83 to the sellers.[4]

Plaintiffs also say they should have the same capital gain treatment allowed in *Denison*. But again, that case is different from ours. There, the taxpayers entered into a joint venture agreement in which a new corporation was formed and they were to receive shares of its stock. A dispute over implementation of the agreement arose and the taxpayers sued for breach of contract. The Tax Court held that the amount received in settlement of the suit by the taxpayers, for which they relinquished their right to acquire the stock, was taxable as capital gain. 46 T.C.M. (P–H) at 1757. The court found their interest under the agreement to be as investors, unlike our situation where plaintiffs were employees and the payment was for options issued in compensation for services. *Id.* *Denison* was not decided under section 83 and no employee stock option plan was involved.

■ By its terms, section 83 is inapplicable when a stock option does not have a readily ascertainable fair market value at the time of its transfer. I.R.C. § 83(e)(3). In arguing that it is improper to employ section 83 here, plaintiffs emphasize that the options here did not have a readily ascertainable fair market value when they were granted. However, effectively codifying the pre-existing rule of *LoBue*, 351 U.S. at 249, 76 S.Ct. at 804, Treasury Regulation § 1.83–7(a) provides that

> If section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable fair market value at the time of grant, sections 83(a) and 83(b) shall apply at the time the option is exercised or otherwise disposed of.... If the option is sold or otherwise disposed of in an arm's length transaction, sections 83(a) and 83(b) apply to the transfer of money or other property received in the same manner as sections 83(a) and 83(b) would have ap-

---

**4.** The court implies no conclusion about the deductibility of the payments by McGraw or its subsidiary in these circumstances. Whether the motive of a successor to the entity which set up the option plan affects the tax consequences to it is not presented in this case. Normally the treatment of the grant of options as compensa- tion results in a corresponding deduction by the employer. I.R.C. § 83(h). But whether a separate entity's purchase of the options for capital acquisition purposes leads to the same result is apparently at issue in the Tax Court. *See Edison International, Inc. v. Commissioner*, No. 42305–84.

plied to the transfer of property pursuant to an exercise of the option. *See also Welsh v. United States*, 2 Cl.Ct. 417, 419 (1983). So, by the regulation, when plaintiffs "disposed of" these stock options by selling them to McGraw, section 83(a) became applicable. Because they were paid an amount based on the difference between the previously fixed exercise prices of the SWI options and McGraw's tender offer price to the other SWI shareholders, the requirement for an arm's length transaction was met. As a result, section 83(a) applies to the transfer of the purchase money in the same way it would have applied to a transfer of stock pursuant to the exercise of the option. Treas. Reg. § 1.83–7(a); *see Bagley*, 85 T.C. at 673. Therefore, the amounts plaintiffs received for their unexercised SWI stock options must be taxed as ordinary income, not as capital gain.

## II

■ Section 1222(3) defines long-term capital gain as "gain from the sale or exchange of a capital asset held for more than 1 year." Plaintiffs say the payments they received for their SWI stock options fall within this definition. However, they overlook section 1234, which specifically deals with options to buy or sell. Section 1234(a)(1) says that the tax treatment of the gain or loss attributable to the sale or exchange of an option is determined by the character of the property to which the option relates. SWI stock held by plaintiffs would have been a capital asset, and if section 1234(a)(1) stood alone, the SWI options would have been capital assets subject to capital gain treatment.

Section 1234(a)(3)(B), however, stipulates that "in the case of gain attributable to the sale or exchange of an option," section 1234(a)(1) shall not apply to "any income derived in connection with such option which ... is treated as other than gain from the sale or exchange of a capital asset." The Senate report on this provision says that section 1234 is inapplicable when there is gain on the sale of unexercised, compensatory stock options.

> It is made clear that [section 1234] does not apply to gains on the sale of an option in any case in which income derived in connection with the option would be treated, without regard to this section, as ordinary income. As a result, the section will not apply to gain from the sale of an employee stock option which is in the nature of compensation to the employee.

S.Rep. No. 1983, 85th Cong., 2d Sess. 78, *reprinted in* 1958 U.S.Code Cong. & Ad. News 4791, 4867; *see* Treas.Reg. § 1.-1234–1(e)(1). Therefore, because the money plaintiffs received in exchange for the unexercised SWI stock options was "in the nature of compensation," section 1234(a)(1) is inapplicable. *See Bagley*, 85 T.C. at 674 n. 18.

## Conclusion

Accordingly, it is ORDERED that defendant's cross-motion for summary judgment is GRANTED, plaintiffs' motion for summary judgment is DENIED, and the case will be DISMISSED.