ESTATE OF O. W. KILLAM, DECEASED, RADCLIFFE KILLAM, JOHN G. HURD AND DOUGLAS O. HUNT, INDEPENDENT EXECUTORS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64475–64478.   Filed November 30, 1959.

*Weldon J. Squyres, Esq.*, and *Arthur Squyres, Esq.*, for the petitioners.

*John J. King, Esq.*, for the respondent.

TIETJENS, *Judge:* The respondent determined deficiencies in income tax and additions to tax as follows:

| Petitioner | Year | Deficiency | Additions |
|---|---|---|---|
| Estate of O. W. Killam, Deceased | 1952 | $48,747.10 | |
| Winfield Killam | 1952 | 581.44 | |
| | 1953 | 563.98 | |
| Radcliffe Killam and Sue Spivey Killam | 1952 | 581.44 | $34.89 |
| | 1953 | 1,496.78 | 89.81 |
| John G. Hurd and Estate of Patricia K. Hurd, Deceased, Radcliffe Killam, Independent Executor | 1952 | 564.34 | 33.36 |
| | 1953 | 1,285.36 | |

The issues are (1) whether the sale of an oil payment in 1952 resulted in capital gain or ordinary income subject to depletion, and (2) whether a payment for purchase of assets of an oil lease should be allocated between the oil reserves and the equipment. Certain facts are stipulated. The taxpayers' returns were filed with the director of internal revenue at Austin, Texas.

### FINDINGS OF FACT.

The stipulation of facts and the exhibits thereto are incorporated by reference.

---

[1] Proceedings of the following petitioners are consolidated herewith: Winfield Killam, Docket No. 64476; Radcliffe Killam and Sue Spivey Killam, Docket No. 64477; and John G. Hurd and Estate of Patricia K. Hurd, Deceased, Radcliffe Killam, Independent Executor, Docket No. 64478.

On July 1, 1952, O. W. Killam had owned and operated for more than 6 months a producing oil and gas lease known as the Bruni 77 Lease, located in the Quien Sabe Field, Webb County, Texas. On that date the lease and well equipment on such lease had an adjusted basis in the hands of Killam of $105,655.45, and the leasehold an adjusted basis of $78,238.30.

In 1952 and 1953, Winfield Killam, Radcliffe Killam, and John G. Hurd were equal partners in a partnership doing business as Killam and Hurd.

On July 1, 1952, O. W. Killam sold, transferred, and assigned all of his interest in and to the equipment and leasehold of the Bruni 77 Lease to Killam and Hurd reserving to himself, his heirs, and assigns the following:

(1) Seventy-five per cent of seven-eighths (75% of ⅞ths) of the oil, gas and other minerals produced, saved and marketed from the above described property until O. W. KILLAM his heirs and assigns, shall have received, without deduction of any kind or character, from the proceeds from the sale of seventy five per cent of seven eighths (75% of ⅞) of the oil, gas and other minerals produced from the above described property, the sum of $150,000.00, together with an additional sum equivalent to four per cent (4%) interest per annum from the date of the unpaid balance thereof, application of all sums to be made, as received first to accrued and unpaid interest and then to the unpaid balance of said sum of $150,000.00. The purchaser of said interest in current production shall be entitled to deduct and pay severance and production taxes assessed against the same, but such taxes shall not be considered in determining when said sum of $150,000 and interest have been received. Assignees shall promptly pay before delinquency all ad valorem taxes levied and assessed against the interest hereby conveyed and shall not be entitled to reimbursement therefor from assignor.

(2) If, as and when O. W. KILLAM, his heirs or assigns, shall have received the aforesaid sum of $150,000.00, plus interest at the rate of four per cent (4%) per annum from date, as above provided, then the said O. W. KILLAM, his heirs and assigns, shall be entitled to receive (and same is hereby excepted from this assignment), the additional sum of $200,000.00 with interest at the rate of four per cent (4%) per annum on the unpaid balance thereof from the date of the last payment on the aforesaid sum of $150,000.00, from the proceeds of the sale of eighty per cent of seven-eighths (80% of ⅞) of the oil, gas and other minerals produced from the aforesaid property. Application of all sums received are to be made, as received, first to accrued and unpaid interest and then to the unpaid balance of said sum of $200,000.00.

Under the agreement Killam and Hurd paid to O. W. Killam cash in the amount of $105,655.45.

On August 14, 1952, the $150,000 oil payment reserved in the above lease was assigned by O. W. Killam to Richard F. Campbell, for $150,000 in cash. Campbell financed the purchase by borrowing this amount from a bank at 3½ per cent interest, giving a deed of trust for the oil payment as security. This oil payment paid out in January 1953.

On January 7, 1953, the $200,000 oil payment reserved in the above lease was assigned by O. W. Killam to Richard F. Campbell for $200,000 in cash. Campbell financed this purchase by borrowing $200,000 from the same bank at 3 per cent interest, giving a deed of trust for the oil payment as security. This oil payment paid out in September 1953.

### OPINION.

The respondent determined that the $150,000 received by O. W. Killam from Richard F. Campbell in 1952 for the assignment of an oil payment of that sum plus interest was ordinary income subject to depletion.

The petitioners contend that the transaction was a sale resulting in long-term capital gain. They say, first, that the agreement for sale of the lease included an agreement to find a purchaser for the $150,000 oil payment and its transfer was arranged for as part of the lease transaction, hence the lease and oil payment were in effect sold to two purchasers for $255,655.45, subject to a single reserved oil payment of $200,000. In the alternative the petitioners contend that the oil payment of $150,000 was a capital asset in the hands of Killam, separate from the subsequent oil payment, hence its sale resulted in long-term capital gain. They cite *Witherspoon* v. *United States*, a decision of the United States District Court, for the Northern District of Texas in 1956, not officially reported, to the effect that assignment of mineral interests in which two reservations of limited overriding royalty or production payments were made, created two separate reserved interests and the proceeds of the sale of one of these resulted in capital gains.

In *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958), the Supreme Court held that transfers of certain oil or sulphur payments were transfers of rights to receive future income, the proceeds of which were taxable to the sellers as ordinary income subject to depletion. The Court commented:

The purpose of § 117 was "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See Burnet v. Harmel, 287 U.S. 103, 106, 53 S. Ct. 74, 75, 77 L. Ed. 199. And this exception has always been narrowly construed so as to protect the revenue against artful devices. See Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S. Ct. 20, 24, 100 L. Ed. 29.

   *      *      *      *      *      *      *

Only a fraction of the oil or sulphur rights were transferred, the balance being retained.

   *      *      *      *      *      *      *

The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the

recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.

These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect.

In a footnote to the *Lake* case the Court mentions the position of the respondent, as announced in a ruling published as I.T. 4003, 1950–1 C.B. 10, to the effect that the assignment of an in-oil payment right, not pledged for development, which extends over a period less than the life of the depletable property interest from which it is carved, is essentially the assignment of expected income from such property interest, but that this conclusion does not apply where the assigned right constitutes the entire depletable interest of the assignor in the property or a fraction extending over the entire life of the property.

The petitioners argue that the *Lake* case is not applicable to the facts here, saying that the $150,000 oil payment was not "carved out" of a larger interest, but was a separate property which Killam transferred completely.

According to the *Lake* case, the essence of the arrangement is to be determined by its total effect. Killam transferred this lease reserving and excepting a quantity of oil sufficient to pay $350,000 plus interest. Had he done nothing more this retained oil would have paid him ordinary income subject to depletion until September 1953. However, he transferred for cash a part of that reserved oil, "carving out" a part extending over a period less than the life of the entire depletable property interest. As in *Lake*, "The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future." Killam transferred only a part of his rights retaining the balance. The separation of the reserved oil into two successive units was Killam's device and seems transparent as an attempt to convert ordinary income into capital gain. The total effect of the arrangement was to anticipate income. In our view it makes no difference whether the transfer was simultaneous with or subsequent to the transfer of the lease. The *Witherspoon* case, *supra*, cited by the petitioners, is distinguishable in that the two payments there retained were payable concurrently while here the payments were successive.

In *Arnfeld* v. *United States*, 163 F. Supp. 865 (1958), the Court of Claims held that income realized on the transfer of an annuity policy prior to its maturity was taxable as ordinary income. The court there stated "the issue here becomes one of whether the plaintiffs can

convert what would in time constitute ordinary income * * * into capital gain." In discussing the *Lake* case and the plaintiffs' asserted distinction the court commented (p. 870)—

But here, plaintiffs contend, Elsa Wineman was not selling or assigning only future income: she sold her entire ownership in an income-producing capital asset and thereby relinquished forever all rights thereto. In answer to plaintiffs on this point, we are unable to agree that a transfer of the entire asset is dispositive of the case.

See also *Hort* v. *Commissioner*, 313 U.S. 28 (1941), cited in *Arnfeld*, *supra*. We sustain the respondent on this issue.

The second issue concerns the allocation of the payment of $105,655.45. Killam and Hurd allocated the entire payment as the cost basis of lease and well equipment. The respondent determined that the lease had a fair market value of $211,000 and the equipment $105,655.45 and allocated the consideration 50 per cent to the depreciable and 50 per cent to the nondepreciable assets. The petitioners contend that they contracted to acquire the equipment at its book value and correctly allocated the entire payment to equipment.

The partners agreed to operate the lease in a prudent manner during payout of the oil payments. The oil payments were payable out of 75 per cent or 80 per cent of seven-eighths of the oil. There was a part of production available to the partnership immediately and seven-eighths of it after payout of the reserved payments. Plainly, the purchasers acquired the oil reserves and there was some value to this at the time of the transaction. There was testimony that in 1954 the Internal Revenue Service questioned the consideration paid O.W. Killam for the lease and that the partnership then conveyed to him an oil payment of $100,500 as additional consideration. This tends to support the valuation of $211,000 for the whole property. There is no evidence to show that the respondent's valuation was wrong or that the allocation was erroneous. The respondent is sustained.

*Decisions will be entered under Rule 50.*