NORMAN FREEMAN AND ERNESTINE H. FREEMAN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2416–65—2418–65, 1362–66. Filed April 28, 1967.

[1] Proceedings of the following petitioners are consolidated herewith: Albert H. Halff and Lee Benson Halff, docket No. 2417–65; Mayer H. Halff and Maureene Halff, docket No. 2418–65; and George W. Llewellyn and Betty Halff Llewellyn, docket No. 1362–66.

*Leland C. Fiske*, for the petitioners.
*George W. Ledbetter*, for the respondent.

OPINION

Scott, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the taxable year ended December 31, 1962, in the following amounts:

| Docket No. | Petitioners | Deficiency |
| --- | --- | --- |
| 2416–65 | Norman and Ernestine H. Freeman | $8, 772. 28 |
| 2417–65 | Albert H. and Lee Benson Halff | 8, 410. 30 |
| 2418–65 | Mayer H. and Maureene Halff | 24, 090. 93 |
| 1362–66 | George W. and Betty Halff Llewellyn | 22, 330. 86 |

In their respective petitions, petitioners Norman and Ernestine H. Freeman and petitioners Albert H. and Lee Benson Halff claim over-payments in their income tax for the calendar year 1962.

The issue for decision is whether percentage depletion deductions taken against bonus income received on the grant of oil and gas leases in 1955 should be returned to income in 1962 on those tracts which were not held by production beyond expiration of the lease in 1962 and, in the alternative, whether partial extension of a lease without consideration by a lessor, who with his immediate family owns all the stock of the corporation to which the lease was assigned shortly before its expiration date, precludes restoration by all lessors, of depletion previously taken on nonproductive tracts.

The case was submitted under Rule 30 of the Rules of Practice of this Court, with the facts fully stipulated. The stipulated facts including the exhibits submitted with the stipulation are found accordingly.

Norman Freeman and Ernestine H. Freeman, husband and wife who resided at the date of the filing of this petition herein in Dallas, Tex., filed a joint Federal income tax return for the calendar year 1962 with

the district director of internal revenue at Dallas, Tex. Albert H. Halff and Lee Benson Halff, husband and wife who resided at the date of the filing of their petition herein in Dallas, Tex., filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue at Dallas, Tex. Mayer H. Halff and Maureene Halff, husband and wife who resided at the date of the filing of their petition in this case in Richardson, Tex., filed a joint Federal income tax return for the taxable year 1962 with the district director of internal revenue at Dallas, Tex. George W. Llewellyn and Betty Halff Llewellyn, husband and wife who resided at the date of the filing of their petition in this case in Dallas, Tex., filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue at Los Angeles, Calif.

All petitioners are members of a partnership known as Halff Interests which owns oil and gas mineral rights in Texas. The partnership filed its Federal partnership return of income for the calendar year 1962 with the district director of internal revenue at Dallas, Tex.

Halff Interests entered into an agreement with Shell Oil Co. (hereinafter referred to as Shell) on March 7, 1955, to grant to Shell leases on certain tracts of land in Upton County, Tex. Shell agreed that it would, subject to examination and approval of title and leases by its attorneys, buy five leases from petitioners.[2] The basic provisions to be incorporated into each of the five leases were set forth in the agreement. The agreement provided for a bonus to be paid by Shell upon delivery of the leases and approval of title by Shell of "$93,000 plus an additional sum determined by multiplying $100.00 times the number of net mineral acres covered by said leases." The agreement also provided that as to each of the tracts to be included in the five leases, the lessors granted to Shell the option to purchase a new lease which should be dated on the date of the termination of the expired lease and have the same provisions as the original lease except that at Shell's election any of the leases should be for a primary term of 5 years and that "within 60 days after delivery of a new lease by virtue of this option Shell shall pay to those entitled thereto a bonus of $100.00 times the number of acres covered by that particular new lease." Three of the leases were executed as of March 7, 1955, and two as of April 1, 1955, because the tracts covered by these two conveyances were under lease to Humble Oil & Refining Co. until the day before April 1, 1955.

---

[2] Although the property was apparently that of the partnership, we will for convenience refer to the petitioners herein, who were partners, as the lessors or recipients of payments under the lease even though the income came to petitioners only by way of being distributable income of the partnership.

Also executed on April 1, 1955, was a contract which provided the manner in which the bonus, which totaled $1,279,635.86 for all five leases, was to be paid. An amount of $99,597.86 was to be paid on delivery of the leases, and the remaining $1,180,038 was to be paid in six equal annual installments of $196,673, the first due on January 15, 1956.

The leases which were granted to Shell, referred to respectively as leases No. 1, 2, 3, 4, and 5, pertained to a total of 26,081.705 surface acres. The leases were dated, provided for a primary term, and covered the number of acres and tracts as follows:

| Lease No.— | Dated | Primary term | Number of tracts | Number of acres | Number of bonus acres |
|---|---|---|---|---|---|
| | | *Years* | | | |
| 1 | Mar. 7, 1955 | 3 | 10 | 8,074.975 | [1] 3,402.73 |
| 2 | -----do-------- | 7 | 18 | 14,919.07 | 6,599.73 |
| 3 | -----do-------- | 7 | 1 | 640.00 | 640.00 |
| 4 | Apr. 1, 1955 | 3 | 1 | 640.00 | 320.00 |
| 5 | -----do-------- | 7 | 1 | 1,807.66 | 903.83 |

[1] The "bonus acres" are noted in pencil on the lease documents. The bonus acre figure on the copy of lease No. 1 which is in evidence is illegible. If the figure 3,402.63 is used, the total bonus which was paid would equal the lump sum, plus $100 per bonus acre. ($93,000+$1,186,635.86=$1,279,635.86) This would comply with the agreement of Mar. 7, 1955, which as stated herein provided for a bonus of "$93,000 plus an additional sum determined by multiplying $100 times the number of net mineral acres covered by said leases."

Each lease was to extend after the primary term as long as oil, gas, or sulphur was produced from the land. Each lease provided for a percentage of production royalty on oil or gas produced or sulphur mined.

The size of the tracts conveyed in the leases differed. Some tracts comprised only a fraction of a survey section while others comprised one or more survey sections. The following table lists the tracts in each lease and shows its location, surface acreage, and history subsequent to the grant to Shell.

LEASE NO. 1

| Tract No. | Survey section number [1] | Number of acres | History |
|---|---|---|---|
| I---------- | 84-------------------- | 644.1 | Released by Shell on Mar. 7, 1959. |
| II---------- | 88-------------------- | 645.7 | }Held by production. |
| | 85-------------------- | 640 | |
| | 68-------------------- | 645.1 | |
| III---------- | 48-------------------- | 646.1 | Released by Shell on Mar. 7, 1959. |
| IV---------- | 65-------------------- | 640 | }Extended and assigned; lease expired on Mar. 7, 1962. |
| | N W ¼ 82-------------- | 162.375 | |
| V---------- | 64-------------------- | 645.3 | Extended and assigned; lease expired on Mar. 7, 1962. |
| VI---------- | 66-------------------- | 645.8 | }Held by production. |
| | 47-------------------- | 640 | |
| VII---------- | 46-------------------- | 645.5 | Released by Shell on Mar. 7, 1959. |
| VIII---------- | N½ & SW¼ 77---------- | 480 | Extended and assigned; lease expires on Mar. 7, 1962. |
| IX---------- | NE¼ 81---------------- | 160 | Extended and assigned; lease expired on Mar. 7, 1962. |
| X---------- | 13 (less 5 acres)-------- | 635 | Released by Shell on Mar. 7, 1959. |

Footnote at end of table.

LEASE NO. 2

| Tract No. | Survey section number[1] | Number of acres | History |
|---|---|---|---|
| I | 17 | 645.12 | Assigned; lease expired and was released by assignee on Mar. 7, 1962. |
| II | 16 | 645.2 | Assigned; lease expired and was released by assignee. |
| III | 15 | 646.+ | Assigned; lease expired and was released by assignee on Mar. 7, 1962. |
| IV | SW¼ 29 | 161.2625 | The lease on tracts IV to XVIII was assigned, extended, and partially released, under circumstances hereinafter described. |
| V | N½ & SE¼ 29 | 483.7875 | |
| | S/300 30 | 300 | |
| | 53 | 675.74 | |
| VI | 23 | 676.74 | |
| | 60 | 655.8 | |
| VII | 57 | 783.47 | |
| VIII | 58 | 629.4 | |
| IX | 55 | 654.16 | |
| X | 59 | 648.3 | |
| | 2 | 663.2 | |
| XI | N½ 2 | 664.7 | |
| XII | S½ 2 | 664.7 | |
| | 51 | 477.8 | |
| | 52 | 502.5 | |
| XIII | N½ 5 | 320 | |
| XIV | S½ 5 | 320 | |
| | 53 | 519.7 | |
| XV | 6 | 640 | |
| XVI | 7 | 640 | |
| XVII | 50 | 928.7 | |
| XVIII | W½ 10 | 326.15 | |
| | 14 | 646.5 | |

LEASE NO. 3

| | 95 | 640 | Held by production. |
|---|---|---|---|

LEASE NO. 4

| | 67 | 640 | Held by production. |
|---|---|---|---|

LEASE NO. 5

| | 18 | 644.2 | Lease expired on Apr. 1, 1962, at end of primary term, without production. |
|---|---|---|---|
| | 24 | 565.8 | |
| | 25 | 597.66 | |

[1] Any duplication of section numbers arises from the fact that different surveys furnish description of the land. Thus, lease No. 2, tract V, included sec. 53 of the Texas Coast R.R. survey and tract XIV included another sec. 53 of the C. C. Phillips survey.

The leases are generally similar with many provisions being identically worded in each lease. Each lease provided for the lease to continue in effect by drilling or by payment of delay rentals of $1 per acre and each lease carried a provision respecting Shell's option to be granted a new lease at the termination of the original lease.

The two leases which granted more than one tract contained a clause which read:

As to each of the above described [number of tracts] tracts this lease shall be considered a separate and distinct lease so that drilling or reworking operations thereon shall continue this lease in force only as to the lands within that tract.

Lease No. 5, which conveyed only one tract covering land lying in three survey sections, did not contain this clause, nor did lease No. 3

or lease No. 4, each of which contained only one tract of one section. Another clause in the multitract leases reads:

As to any of said [number] tracts, on which operations are not commenced on or before [date], this lease shall terminate as to both parties unless lessee on or before said date shall pay * * * One Dollar ($1.00) per acre for the acreage of the said tract * * *

The clause covering delay rentals in the one-tract leases is worded:

If operations are not commenced on said land on or before [date], this lease shall terminate as to both parties unless Lessee on or before said date shall pay * * * One Dollar ($1.00) per acre for the acreage of said land * * *

Each of the five leases provided that the rights of either party thereunder might be assigned in whole or in part and that "in the event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder." Each of the five leases provided for a release of any portion of the premises described in the lease and that upon such release the lessee was relieved of all obligations of the lease as to the acreage surrendered and "thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases."

The leases expired during 1962 as to tracts IV, V, VIII, and IX (lease No. 1), tracts I to XVIII (lease No. 2) (except as partially extended on tracts IV to XVIII) and the tract conveyed in lease No. 5.

The tracts conveyed by the five leases were geographically related to each other in the following significant manners:

The four tracts of lease No. 1 with respect to which the lease expired on March 7, 1962, compose a single parcel of land, geographically separate from any other land covered by any of the leases. The parcel is not adjacent to or contiguous to any other producing or nonproducing tract of any lease.

Of the tracts which compose lease No. 2, tracts I to III form a parcel but only tracts I and II of that parcel are contiguous to a producing tract. They are contiguous to producing tract VI (lease No. 1). Tract III abuts producing tract VI (lease No. 1) corner-to-corner. Tracts IV to XVIII (lease No. 2) do not directly touch any producing tract. They do abut tracts I to III of lease No. 2 corner-to-corner. Tracts IV to XVIII are contiguous, however, to nonproducing lease No. 5 which is contiguous to producing lease No. 4.

Lease No. 5 and the contiguous producing lease No. 4 each contains only one tract.

From a strictly physical viewpoint, the premises covered by tract VI (lease No. 1), lease No. 2, lease No. 4, and lease No. 5 are a single, continuous parcel of land.

Shell Oil Co. assigned lease No. 2 to Mustang Producing Co. (hereinafter referred to as Mustang) by an instrument dated February 15, 1962, receiving no cash consideration for the assignment. The assignment was recorded March 7, 1962. Mustang, which was incorporated on January 29, 1954, was engaged in the oil business from the date of its organization through the year 1962. The stockholders of Mustang during 1962 were:

| Stockholder | Number of Shares | Relationship to Mayer H. Halff |
|---|---|---|
| Mayer H. Halff | 11, 390 | |
| Maureene Halff | 10 | Wife |
| Julia Halff Keith | 1, 950 | Adult daughter |
| Henry R. Halff | 1, 850 | Adult son |
| Total | 15, 200 | |

The members of Halff Interests owned the following interests in the tracts [3] which were leased under lease No. 2 and assigned to Mustang on February 15, 1962:

| | Percent |
|---|---|
| Rosa Halff Barnet | 31. 2500 |
| Mayer H. Halff | 17. 1875 |
| Albert H. Halff | 17. 1875 |
| Ernestine Halff Freeman | 17. 1875 |
| Betty Halff Llewellyn | 17. 1875 |
| Total | 100. 0000 |

Under date of February 23, 1962, Mayer H. Halff granted an extension of the lease to Mustang for the last 15 of the 18 tracts included in lease No. 2, being tracts IV to XVIII, inclusive, for a period of 7 years from March 7, 1962. He received no cash consideration for the extension.

After March 7, 1962, Mustang executed a release of its interest in all of the tracts of lease No. 2, except with respect to the interest of Mayer H. Halff in tracts IV to XVIII, inclusive.

On the payment in years prior to 1962 by Shell to Halff Interests of the original lease bonus of $1,279,635.86, the partnership claimed, and was allowed a depletion deduction of 27½ percent thereof. None of this depletion deduction was restored to income by the partnership when the leases expired on some of the tracts in 1962.

A statement attached to the partnership return stated that no depletion was restorable to the partnership income because of expiration

[3] The stipulation refers to "the ownership of the members of Halff Interests" in these tracts and we have based this finding on that stipulation, although other portions of the stipulation refer to the tracts being owned by Halff Interests. The leases were actually executed by each of the five named members of the partnership.

in part of the Shell leases because the five leases constituted one leasing transaction and that production had been obtained on part of the leased acreage.

Each of petitioners included in the income reported on his income tax return for the year 1962 an amount stated to be his distributable income from Halff Interests. Since Halff Interests on its partnership return of income had not restored to its partnership income for 1962 any of the depletion deduction previously taken with respect to the bonus on the Shell leases, each petitioner reported a lesser income from the partnership than he would be required to report if Halff Interests were required to restore to its income in 1962 the depletion it had previously taken with respect to the bonus received from Shell with respect to the five leases as determined by respondent.

Respondent in his notices of deficiency increased the distributive income of each of petitioners from Halff Interests for the year 1962 because of increasing the partnership income for that year by restoring depletion to partnership income in the following amounts:

| Lease No.— | Tract Nos.— | Restored depletion |
|---|---|---|
| 1 | IV, V, VIII, and IX | $30, 685. 00 |
| 2 | I to XVIII | 194, 941. 17 |
| 5 | (¹) | 26, 697. 10 |
| Total | | 252, 323. 27 |

¹ The stipulation states that lease No. 5 "covers three tracts" but the lease instrument attached to the stipulation shows that it conveyed three sections but only one tract.

Respondent arrived at the amount of depletion to be restored to the partnership income in 1962 as follows:

The total original bonus paid by Shell for the five leases was divided by the total number of bonus acres included in these leases to arrive at an amount of $107.41 bonus per acre. This amount was multiplied by the number of bonus acres in the tracts as to which leases expired in 1962 totaling 8,542.40 bonus acres. The resultant amount, $917,539.18 of the bonus paid by Shell was considered as the bonus applicable to the acreage as to which the leases expired in 1962 and 27½ percent of this amount or $252,323.27 was considered as the depletion previously taken which was to be restored to partnership income in 1962.

Both parties recognize the well-established rule announced by the Supreme Court in *Burnet* v. *Harmel*, 287 U.S. 103 (1932), that where a bonus is received by a lessor upon the grant of an economic interest in a mineral deposit, the payee is entitled to a depletion deduction, and in accordance with the decision in *Herring* v. *Commissioner*, 293 U.S. 322 (1934), this deduction is available to the payee in the year of the receipt of the bonus even though no production occurs in that year. The payee of such a bonus is entitled to either cost depletion or

percentage depletion computed on the basis of the gross income from the property. Respondent's regulations provide that if the grant of an economic interest in a mineral deposit with respect to which a bonus was received expires, terminates, or is abandoned before there has been any income derived from the extraction of mineral, the payee must, in the year of such expiration, termination, or abandonment, return as income the deduction for depletion previously taken.

Respondent's regulation providing for such restoration of depletion deductions previously allowed on the basis of cost depletion was specifically approved in *Douglas* v. *Commissioner*, 322 U.S. 275 (1944), and the fact that the regulation likewise requires a restoration in the year of expiration, termination, or abandonment where the depletion allowance was on a percentage basis has been sustained in numerous cases.[4] See *Louisiana Delta Hardwood Lumber Co.*, 12 T.C. 576, 578 (1949), and cases there cited, affirmed per curiam 183 F. 2d 189 (C.A. 5, 1950).

Since both parties recognize the well-established principles with respect to depletion allowances on bonus payments and the restoration of such previously taken deductions to income upon expiration of the lease without production having been obtained, they both center their arguments in the instant case on whether, under the agreed facts herein, income had been derived from the production with respect to petitioners' "grant of an economic interest in a mineral deposit" to Shell prior to the expiration, termination, or abandonment of that grant.

Petitioners take the position that their agreement with Shell of March 7, 1955, for the execution of five separate leases to Shell was a single transaction or "grant of an economic interest in a mineral deposit," and since there has been production on some of the tracts

---

[4] Respondent's regulations have for many years provided for the allowance of a depletion deduction on a bonus payment and its restoration to income where the lease is terminated without production having been obtained. These regulations applicable to the years here in issue provide as follows:

Sec. 1.612-3 [Income Tax Regs.] Depletion; treatment of bonus and advanced royalty.

(a) *Bonus*. (1) If a bonus in addition to royalties is received upon the grant of an economic interest in a mineral deposit, or standing timber, there shall be allowed to the payee as a cost depletion deduction in respect of the bonus an amount equal to that proportion of his basis for depletion as provided in section 612 and § 1.612-1 which the amount of the bonus bears to the sum of the bonus and the royalties expected to be received. * * *

(2) If the grant of an economic interest in a mineral deposit or standing timber with respect to which a bonus was received expires, terminates, or is abandoned before there has been any income derived from the extraction of mineral or cutting of timber, the payee shall adjust his capital account by restoring thereto the depletion deduction taken on the bonus and a corresponding amount must be returned as income in the year of such expiration, termination, or abandonment.

\* \* \* \* \* \* \*

(d) *Percentage depletion deduction with respect to bonus and advanced royalty*. In lieu of the allowance based on cost depletion computed under paragraphs (a) and (b) of this section, the payees referred to therein may be allowed a depletion deduction in respect of any bonus or advanced royalty for the taxable year in an amount computed on the basis of the percentage of gross income from the property as provided in section 613 and regulations thereunder.

covered in the five leases made pursuant to that grant, they are not required to return as income any portion of the depletion deduction taken by them in prior years with respect to the bonus received upon execution of the leases.

Respondent takes the position that five separate leases were executed by petitioners and that these five separate leases constituted 31 separate interests or properties of petitioners in separate tracts or parcels of land, that a proportionate amount of the bonus received by petitioners upon the execution of the leases is applicable to each of the various parcels on the basis that the number of "bonus acres" included in that parcel bears to the total "bonus acres" covered by all tracts in the five leases. In effect, respondent has included in petitioners' income for the years here involved an amount previously deducted by petitioners as depletion, computed by multiplying the bonus acres in the acreage with respect to which the leases terminated by the average amount of depletion taken per bonus acre in prior years.

Petitioners cite no authority in support of their contention that the agreement of March 7, 1955, to grant oil and gas leases to Shell was in effect one lease from petitioners to Shell. This agreement specifically provided for five separate leases of specifically designated tracts.

The fully stipulated facts do not show why a provision for five separate leases was made, but in accordance with the agreement, five separate lease agreements were executed, three dated March 7, 1955, and two dated April 1, 1955. We find no basis in the record for considering the agreement between petitioners and Shell of March 7, 1955, to create in effect one lease as distinguished from five separate leases to the same lessee. Since petitioners entered into five leases and not one lease to Shell, the holdings of the Court of Appeals in *Driscoll* v. *Commissioner*, 147 F. 2d 493 (C.A. 5, 1945), reversing with respect to the depletion issue and affirming as to another issue a Memorandum Opinion of this Court, and *Houston Farms Development Co.* v. *Commissioner*, 194 F. 2d 520 (C.A. 5, 1952), reversing 15 T.C. 321 (1950), do not require the conclusion in the instant case that no portion of the depletion previously deducted by petitioners should be included in their income in the years here in issue even if petitioners are correct in their contention that those cases hold that no restoration of depletion is required where a single lease terminates as to only a portion of the acreage covered by it, which as hereinafter discussed we do not consider to be the proper interpretation of those decisions.

Where there has been one lease of one property and depletion has been taken on a bonus received upon execution of the lease, the question of whether the depletion deduction should be included in income in the year in which the lease expires or is terminated with respect to the entire acreage included in the one lease of the one property requires only a determination of whether there has been production under that

one lease of that one property. See *Dolores Crabb*, 41 B.T.A. 686 (1940), affd. 119 F. 2d 772 (C.A. 5, 1941), and *Seth Campbell*, 41 T.C. 91 (1963). However, where several leases covering properties in the same general area have been executed and some of the leases released and others retained by production or otherwise, or one lease executed with a portion of the acreage included in the lease released and other portions retained by production or otherwise, the question has arisen as to whether any of the depletion deduction on the bonus payment previously allowed should be included in the taxpayer's income in the year of termination of some of the leases or termination of the lease with respect to a portion of its acreage. This was the issue involved in *Driscoll* v. *Commissioner*, *supra*, and *Houston Farms Development Co.* v. *Commissioner*, *supra*.

Prior to the decisions in the *Driscoll* and *Houston Farms Development* cases, the problem of releases of certain leases or of part of the acreage with respect to one lease had arisen before this Court and other courts under different factual situations. The case of *Grace M. Barnett*, 39 B.T.A. 864 (1939), involved one lease of approximately 391 acres to one lessee, by the terms of which the lease was to terminate at the end of 1 year unless prior to that time drilling had been commenced or the lessee had paid an additional rental to the lessor. The lease, however, provided that a proportionate amount of the fixed rental to be paid might be paid with respect to a portion of the acreage, thus holding that portion of the acreage even though the balance was released from the lease. The lessee did not commence any drilling operations during the first year and failed to pay to the taxpayer the required sum to extend the lease with respect to 241 of the 391 acres covered by the lease and the lease therefore terminated or expired with respect to the 241 acres. The *Barnett* case was a fully stipulated case and the parties had stipulated that "$6,779.93 of the depletion of $11,000 allowed as a deduction on the $40,000 lease bonus in computing petitioner's net income for [1934] is applicable to the 241 acres as to which the lease expired in 1935." The taxpayer in *Grace M. Barnett*, *supra*, contended that there should be no restoration of depletion previously taken to income in 1935, the year there involved, because the lease did not terminate in that year as to all of the land covered by the lease. Respondent, relying on the stipulated fact which we have quoted, argued that it was immaterial whether or not the lease was forfeited in 1935 as to the remaining acreage. On the basis of the facts in that case, we sustained respondent with no discussion as to whether the one lease was of one property for the purpose of computation of percentage depletion which was the basis on which depletion had been previously allowed on the bonus received upon execution of the lease.

The next case involving this issue considered by this Court was *J. T. Sneed, Jr.*, 40 B.T.A. 1136 (1939), affd. 119 F. 2d 767 (C.A. 5,

1941), certiorari denied 314 U.S. 686 (1941). The *Sneed* case involved a taxpayer who owned approximately 80,000 acres of land lying in contiguous tracts in Moore County, Tex. In 1926 he made a number of 10-year commercial oil and gas leases to various individuals, firms, and corporations which, in the aggregate with similar leases he had previously made, covered the entire ranch. During the years 1925 and 1926 the taxpayer had made about 50 different leases of various tracts included in his ranch. In 1926 he had received approximately $211,000 as cash bonuses for execution of the leases in that year and had claimed and been allowed a percentage depletion deduction with respect to the entire amount of the bonuses. In 1936, the year in issue in *J. T. Sneed, Jr. supra*, no wells had been drilled on some 26 tracts of land on the taxpayer's ranch covered by leases made in 1926 and the leases were surrendered by the various lessees in accordance with the terms of the leases. The bonuses which the taxpayer had received in 1926 upon the leases surrendered in 1936 aggregated $120,920.25, and the depletion which the taxpayer had been allowed in 1926 with respect to those leases aggregated $33,528.07. Respondent took the position that the $33,528.07 should be included in the taxpayer's income in 1936 and the taxpayer contended that no such inclusion was proper since, although separate leases were made in 1926 covering separate tracts of land, "nevertheless, since petitioner's ranch was 'one property' as defined in the Commissioner's regulations, and since that property has sustained a subtantial amount of depletion during the period 1926 to 1936, inclusive," he was entitled to retain the benefit of all the depletion deductions allowed to him in prior years. Relying on our decision in *Vinton Petroleum Co. of Texas*, 28 B.T.A. 549 (1933), affd. 71 F. 2d 420 (C.A. 5, 1934), certiorari denied 293 U.S. 601, and respondent's regulation as then in effect, we concluded that what the taxpayer in *J. T. Sneed, Jr.*, did "was to lease the land included in his ranch to various individuals and corporations by separate leases and received a separate bonus for each separate lease," and that under such circumstances each separate lease should be treated as a separate property.[5]

The Court of Appeals in *Sneed* v. *Commissioner*, 119 F. 2d 767 (C.A. 5, 1941), in affirming our decision stated at page 769:

We hold that "the property" means generally each separate tract, if operated by the owner, or each separate lease if leases are made. * * * We think that by leasing it [the ranch] in separate parcels to different persons he [the taxpayer] separated it into as many different properties as there were leases made. * * *

---

[5] The definition of property contained in art. 23(m)–1(j), Regs. 94, applicable to the taxable year 1936 involved in *J. T. Sneed, Jr.*, 40 B.T.A. 1136 (1939) provided:

(j) "The property," as used in section 114(b) (2) (3), and (4) and articles 23(m)–1 to 23(m)–19, inclusive, means the interest owned by the taxpayer, freehold or leasehold, in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

The next case coming before this Court involving a release of less than all the acreage leased by a particular taxpayer was *Mary F. Waggoner*, 47 B.T.A. 699 (1942). The major issue in that case dealt with a transfer of leases prior to their expiration. However, a secondary issue involved one lease executed in 1937 on which a bonus had been received and a percentage depletion deduction taken in the year of receipt, 40 acres of which were terminated in 1938 for nonpayment of rental without production having been obtained therefrom. The part of the cash bonus paid on execution of this lease in 1937 which we found to be allocable to the 40 acres with respect to which the lease terminated in 1938 was $500. We held that the depletion deduction taken in 1937 with respect to this $500 was required to be restored to the income of the taxpayer in 1938, relying on our decision in *J. T. Sneed, Jr., supra*.

The next case involving a release of a part of the acreage under one lease which was considered by this Court was the *Driscoll* case which was reversed by the Court of Appeals in *Driscoll* v. *Commissioner*, 147 F. 2d 493 (C.A. 5, 1945). Without discussion of whether one property or more than one property was involved in the lease, we held on the basis of *Mary F. Waggoner, supra*, that where a lease was terminated as to a portion of the land prior to production of oil, there should be restored to income in the year of such termination that part of the depletion previously taken which was allocable to the acreage released. The Court of Appeals, in reversing this Court, likewise did not discuss whether one or more properties were involved but based its holding on the proposition that depletion of oil and gas should not be measured on an acreage basis. In so holding, the Court of Appeals stated (147 F. 2d at 495):

Depletion, synthetic or real, is not measured on an acreage basis, nor can it be said that the grant of mineral rights has expired, terminated, or been abandoned so long as the privilege or lease exists and activity under such grant looking to production may reasonably be expected. The decisions of this Court in Sneed v. Commissioner of Internal Revenue, 5 Cir., 119 F. 2d 767; Commissioner of Internal Revenue v. Seeligson, 5 Cir., 141 F. 2d 358; and Crabb v. Commissioner of Internal Revenue, 5 Cir., 119 F. 2d 772, are contrary to the contentions of the Commissioner and the views of the Tax Court.

The regulation of the Commissioner provides for restoration to income of the depletion taken when there has been no production and the lease has expired, terminated, or been abandoned, and the Commissioner may not stretch his regulation so as to construe it to be applicable when "any part of the lease has expired, terminated, or been abandoned."

The dissenting opinion of one of the judges of the Court of Appeals in *Driscoll* v. *Commissioner, supra*, pointed out that although "depletion" may not be "measured on an acreage basis," the statute provides for "depletion upon gross income from 'the property', which has been administratively and judicially defined to mean each separate parcel of one or more tracts of mineral property that is treated by the

taxpayer as a unit." The statement then follows, "When the acreage here involved was abandoned by the lessee, it necessarily became a separate 'property' that could be held or re-leased as the taxpayer saw fit; as such, its gross income and depletion were subject to separate computation."

The next case involving this issue that came before this Court, and insofar as we have been able to determine the last such case prior to the instant case, was *Houston Farms Development Co.*, 15 T.C. 321 (1950), reversed 194 F. 2d 520 (C.A. 5, 1952). The taxpayer in *Houston Farms Development Co.*, *supra*, had executed one oil and gas lease covering 29 tracts of 40 acres each "checkerboarded throughout an area comprising approximately 6,500 acres." There had been a bonus payment, and the taxpayer had taken percentage depletion on that payment. In 1944, one of the years before the Court, all but 5 of the 40-acre tracts had been released to the taxpayer by the lessee without any production having been obtained therefrom. In that case we sustained respondent's inclusion in the taxpayer's income for the year 1944 of 24/29ths of the amount of percentage depletion which had been allowed to the taxpayer in 1939 when the leases were entered into. The taxpayer in the *Houston Farms Development* case contended that the bonus payment was not allocable on an acreage basis. We did not accept this contention, but sustained respondent's allocation on an acreage basis, the following comprising the statement in regard to our reasons for so holding (15 T.C. at 326):

In cases presenting substantially similar facts, we have held that where there has been a termination, expiration or abandonment of a part of the acreage under an oil and gas lease there should be an allocation of the total bonus paid to the acreage abandoned and a restoration to income of that portion of the depletion taken with respect to the abandoned acreage. *Grace M. Barnett*, 39 B.T.A. 864; *Mary F. Waggoner*, 47 B.T.A. 699. On the issue of apportionment in a memorandum opinion of this Court we were reversed by the United States Court of Appeals for the Fifth Circuit, *Driscoll* v. *Commissioner*, 147 Fed. (2d) 493. We think that the facts in the instant case are indistinguishable from the controlling facts in the *Driscoll* case, *supra*. Nevertheless, with due deference to the opinion of the Circuit Court in that case, we will adhere to our decision in that case.

We, therefore, conclude that 24/29 of the sum of $27,500 of the depletion deduction previously taken and allowed in 1939 is to be restored to petitioner's income for the taxable year 1944.

The U.S. Court of Appeals for the Fifth Circuit reversed our decision per curiam, merely stating that the *Driscoll* case was indistinguishable. There was a dissent from the opinion of the U.S. Court of Appeals for the Fifth Circuit in *Houston Farms Development Co.* v. *Commissioner*, 194 F. 2d 520, in which the dissenting judge pointed out that the basis for depletion is "27½ per centum of the gross income from the *property* during the taxable year" and that "The taxpayer's interest in each separate mineral property is a separate 'property'," that

it seemed to him that "when the twenty-four 40-acre tracts were surrendered to the taxpayer they became a 'property' separate from the remaining five possibly productive 40-acre tracts," and that as to this separate property there had been no depletion and the previously taken depletion should be restored to income.

In *J. T. Sneed, Jr.*, *supra*, where this Court discussed the question of percentage depletion previously taken with respect to "a property" we concluded that previously allowed depletion on a bonus should be included in income in the year when the lease or grant with respect to that "particular property" terminated without production with respect to that particular property having been obtained. While there is no specific statement in the *Sneed* case that previously allowed depletion on a bonus would not be restored to income if the lease expired as to acreage which was a part of a "property" on which production had been obtained, that this is the basis of our holding can be inferred from the statement that, "Only by accepting petitioner's theory that his entire ranch should be treated as one property could we grant his contention on this point." In neither *Grace M. Barnett*, *supra*, nor *Mary F. Waggoner*, *supra*, where a portion of the acreage in one lease was involved, did this Court discuss the proposition of whether the released acres constituted a separate property from the producing acreage, but there is no indication that such an issue was presented by either party in these cases, it appearing in the *Barnett* case that a stipulation of the parties had in effect removed this issue.

In the *Driscoll* and *Houston Farms Development* cases, this Court likewise did not discuss whether at the time the leases originated the tracts subsequently released constituted separate properties, as defined in the Commissioner's regulations, from the portion of the acreage which was retained by production or otherwise. From the recited facts in those cases, particularly the *Houston Farms Development* case, the tracts released may have been separate "properties" from those retained within the definition contained in respondent's regulations then in effect. As the dissenting judges of the Court of Appeals pointed out in *Driscoll* v. *Commissioner*, *supra*, and *Houston Farms Development Co.* v. *Commissioner*, *supra*, when acreage is released so that it returns to the original lessor, a separate property interest under the definition as set forth in respondent's regulation for many years and as now currently provided for in section 614 of the Internal Revenue Code and respondent's regulations issued pursuant thereto which we will later discuss, obviously arises, since there is a division of interest, one interest continuing in the lessee and another interest being returned to the lessor to use as he sees fit. However, the decisions of this Court and the majority opinions of the Court Appeals previously discussed are based on the inherent assumption that "the property," for restora-

tion of depletion purposes, refers to "the property" created by the execution of the lease with respect to which the bonus was received. As heretofore set forth this interpretation of the term "the property" is specifically adopted in the *Sneed* case by both this Court and the Court of Appeals for the Fifth Circuit. This interpretation of the reference to "the property" is apparently predicated on the fact that the percentage depletion which a taxpayer has been permitted to take at the time the bonus was received is with respect to the income from "the property" (sec. 1.612–3(d), Income Tax Regs., quoted *supra* (fn. 1)), which must of necessity refer to the property with respect to which the bonus was received. Likewise, section 1.612–3(a)(2) refers to the termination of a grant of an economic interest in a mineral deposit "with respect to which a bonus was received" being returned as income in the year of such termination.

Even though a new property may be created in a lessor-taxpayer upon the return to him without production of certain of the previously leased acreage, it is not this "property" with respect to which the bonus on which depletion was previously taken was paid unless the bonus is to be considered as paid on an acreage basis and not as an aggregate amount for each separate property. It was the concept of a bonus being paid on an acreage basis as distinguished from an aggregate amount for "the property" which the Court of Appeals disapproved in the *Driscoll* case and *Houston Farms Development* case. It is not clear that this Court in its opinions in the *Driscoll* and *Houston Farms Development* cases did consider that the bonus was paid per acre and not as an aggregate for the property. A reasonable interpretation of those cases is that since an overall bonus had been paid with respect to several properties created by one lease, a reasonable basis of allocation of the bonus to the various properties was on an acreage basis. The interpretation of those cases as considering the bonus as paid for each separate acre as distinguished from each separate property would cause the decisions therein not to be reconcilable with the *Sneed* case on which the *Waggoner* case, cited in the *Houston Farms Development* case, relied. If our opinions in *Driscoll* and *Houston Farms Development* are considered to depart from the concept of the bonus being paid as an aggregate for a property to this extent we consider the reversal of these decisions by the Court of Appeals for the Fifth Circuit to be a proper interpretation of the law.

The holdings of this Court in the *Driscoll* and *Houston Farms Development* cases can be interpreted as being that wherever a lease or conveyance grant is so drawn that the lease with respect to a portion of the acreage covered by it can be terminated either by failure to pay delay rentals, release, or expiration at a separate time from the termination of the lease with respect to another portion of the acreage

or while that other portion is held by production, the conveyance instrument has as a substantive matter made such a separation in the acreage covered by it that irrespective of other considerations any acre or acres which may be separately released must be considered as a separate property for the purpose of determining whether depletion previously allowed with respect to a bonus should be restored to income. If this interpretation of these cases is proper, and respondent's position in the instant case without in words so stating in effect gives this interpretation to these cases, the amount of the bonus to be restored to income becomes a factual question in each case necessitating a determination as to the amount of bonus paid with respect to the acreage which has reverted to the lessor without production having been obtained on that specific acreage. In some situations a per-acre basis of allocation of the bonus would not be an equitable allocation and in others it might be. See *Beaver Dam Coal Co.* v. *United States*, 370 F. 2d 414 (C.A. 6, 1966). If the proper interpretation of our holdings in the *Driscoll* and *Houston Farms Development* cases is as above outlined, it is clear that the Court of Appeals for the Fifth Circuit disagreed with our view since in its opinion in *Driscoll* that court specifically pointed out not only that a bonus could not be said to be paid on a per-acre basis as distinguished from being paid for an entire lease of property, but also discussed in some detail its view that oil might well be drained from the part of the acreage released when other acreage covered by the same lease was retained, even though drilling had not been commenced on the released acreage and the lease agreement had permitted its termination as to a portion of the acreage covered.

Regardless of the proper interpretation of our prior decisions and those of the circuit court, we now hold that where an aggregate bonus is paid with respect to a "property" no portion of the depletion taken with respect to that bonus payment is required to be restored to income if there is commercial production on that "property." There can be commercial production on a "property" as defined in respondent's regulations and the Internal Revenue Code of 1954 without any producing wells being drilled on some parts of the acreage in that property. In such a situation the lessee may release the portion of the acreage in that property upon which he has decided not to drill even though he has drilled producing wells or pooled other portions of the same property. However, there will have occurred production on the "property" with respect to the income from which in the form of the bonus depletion has been taken by the lessor-taxpayer.

The reliance by the Court of Appeals in the *Driscoll* case on its decision in *Sneed* v. *Commissioner*, 119 F. 2d 767 (C.A. 5, 1941), affirming *J. T. Sneed, Jr.*, 40 B.T.A. 1136, indicates that it was the

conclusion of the Court of Appeals that the released lands in the *Driscoll* case were not a separate property from the lands which had not been released.

In the instant case respondent bases his argument entirely on his contention that the depletion which he has restored to petitioners' income in 1962 was with respect to bonus paid with respect to separate "properties" from the producing properties. Respondent apparently does not contend that the concept of a mineral "property" should be discarded in considering restoration of deductions previously taken for depletion on terminated leases.

In view of the conclusion which we reached from an analysis of the cases dealing with releases of certain leases or certain acreages in a lease, we consider it necessary in the instant case to determine whether the lands with respect to which the leases in the instant case expired in 1962 without any production from the specific acreage having been obtained were separate properties within the definition of section 614(a) of the Internal Revenue Code of 1954 from the lands on which production had been obtained. The facts which we have set forth show that although the bonus payment was determined in part by multiplying $100 by the number of bonus acres involved, it was not necessarily paid with respect to each bonus acre in such a manner as to cause each specified tract to be a separate property.

While the concept of separate mineral properties has been set forth in respondent's regulations for many years and has been recognized by this Court and other courts, the definition of a separate property has been changed by the provisions of section 614 of the Internal Revenue Code of 1954 which had no counterpart in the Internal Revenue Code of 1939 and prior revenue laws.

As we will further discuss, "each separate lease" is no longer necessarily a criterion of "separate property," if in fact it ever was a criterion prior to the enactment of section 614(a) of the Internal Revenue Code of 1954 in cases where the separate leases were between the same lessor and lessee. Much of the discussion in cases under the 1939 Code with respect to separate leases being separate properties deals with situations where the lessees in the leases were different individuals. It is difficult to determine whether separate leases were necessarily viewed as separate properties under the 1939 Code and prior revenue acts if both the lessee and lessor were the same. Since our determination here must be governed by the definition of the term "property" under section 614(a) of the Internal Revenue Code of 1954 and the regulations issued pursuant thereto, the cases involving this issue under the 1939 Code are helpful only to the extent that they discuss terms contained in the present section of the 1954 Code and the regulations issued pursuant thereto.

Section 614(a) of the Internal Revenue Code of 1954 defines property as "each separate interest in each mineral deposit in each separate tract or parcel of land." Respondent, pursuant to the regulation-making authority granted in section 611(a), has promulgated regulations, amplifying this definition.[6]

As specifically set forth in respondent's regulations, several tracts or parcels of land conveyed in a single lease or several leases at the same time from the same owner to the same lessee may create only one "property."

Petitioners argue that even if the five conveyances constitute five leases rather than one, no restoration of depletion is proper on tracts conveyed under lease No. 1 since certain of the tracts conveyed under this lease were productive. However, even though all tracts conveyed under lease No. 1 are considered as being conveyed by a single lease rather than by separate leases of each separate tract, as respondent contends, the various tracts do not constitute a single "property" under the provisions of section 614(a).[7] Under the provisions of this section each separate "interest" in each separate "tract or parcel" is a separate property. The two tracts conveyed under lease No. 1 which are productive and the four nonproducing tracts with respect to which respondent has restored depletion were geographically separate parcels of land. Assuming that respondent is correct in his allocation of depletion previously taken to the various properties, his inclusion of the amount

---

[6] Sec. 1.614–1, Income Tax Regs., provides:

Definition of property.

(a) *General rule*. (1) For purposes of subtitle A of the Code, in the case of mines, wells, and other natural deposits, the term "property" means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land.

(2) The term "interest" means an economic interest in a mineral deposit. See paragraph (b) of § 1.611–1. The term includes working or operating interests, royalties, overriding royalties, production payments and net profits interests.

(3) The term "tract or parcel of land" is merely descriptive of the physical scope of the land to which the taxpayer's interest relates. It is not descriptive of the nature of his rights or interests in the land. All contiguous areas (even though separately described) included in a single conveyance or grant or in separate conveyances or grants at the same time from the same owner constitute a single separate tract or parcel of land. Areas included in separate conveyances or grants (whether or not at the same time) from separate owners are separate tracts or parcels of land even though the areas described may be contiguous. If the taxpayer's rights or interests within the same tract or parcel of land are dissimilar, then each such dissimilar interest constitutes a separate property. If the taxpayer's rights or interests (whether or not dissimilar) within the same tract or parcel of land relate to more than one separate mineral deposit, then his interest with respect to each such separate deposit is a separate property.

\* \* \* \* \* \* \*

(5) The provisions of this paragraph may be illustrated by the following examples:

\* \* \* \* \* \*

*Example* (4), In 1954, a taxpayer acquires from a single owner, in a single deed, three noncontiguous tracts of mineral land for a single consideration. Even if each tract contains part of the same mineral deposit, the taxpayer owns three separate mineral interests each of which constitutes a separate property.

[7] SEC. 614. DEFINITION OF PROPERTY.

(a) GENERAL RULE.—For the purpose of computing the depletion allowance in the case of mines, wells, and other natural deposits, the term "property" means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land.

applicable to the nonproductive tracts of lease No. 1 in petitioners' 1962 income is proper. Even though these tracts were conveyed in the same document with tracts which proved productive, under section 614 and respondent's regulations issued pursuant thereto, they constitute separate properties.

The other tracts as to which respondent restored depletion to petitioners' income upon expiration of the leases in 1962 are not geographically separated from each other or from producing tracts. The producing tracts of lease No. 1 and all the premises conveyed in lease No. 2, lease No. 4, and lease No. 5 are contiguous with a continuous border. See *Berkshire Oil Co.*, 9 T.C. 903 (1947).

Respondent's regulations state that all contiguous areas in a single grant, or in separate grants made at the same time from the same owner, constitute a "single tract or parcel." Thus, separate but contiguous tracts in one lease, or in several leases from the same grantor at the same time, are regarded as a "single property." Therefore, unless for a reason other than geographical location the tracts may be considered as separate "properties," respondent's restoration of depletion on the tracts of lease No. 2 and lease No. 5 is not proper since these tracts form a single parcel with tracts II and VI (lease No. 1) and the tracts in lease No. 4, on which there is production.

The execution dates of lease Nos. 4 and 5 were approximately 3 weeks later than the execution dates of lease Nos. 1, 2, and 3. However, we do not consider the execution dates of the leases to be controlling. The regulations refer to "conveyances or grants" being made "at the same time" in order for contiguous premises to be considered a single tract or parcel. By the agreement dated March 7, 1955, petitioners obligated themselves to make all five conveyances. This obligation was in substance a "grant" followed by five conveyances, two of which were dated approximately 3 weeks later than the other three. In substance, all the properties covered by the five leases were granted to the same lessee, Shell, at the same time, March 7, 1955.

The remaining question is whether the interest of each of petitioners in these five leases was a single interest. Section 614(a) provides that each separate interest of a taxpayer in each separate tract or parcel is a "separate property." Lease No. 1 and lease No. 4, the producing leases, had primary terms of 3 years with the right in the lessee at the end of that time to execute a new lease for an additional period up to 5 years and lease No. 2 and lease No. 5, the nonproducing leases, had primary terms of 7 years with a right in the lessee at the end of that term to execute a new lease for an additional 7-year term.

Respondent's only argument in respect to the variation in the primary term of the leases causing the tracts covered by each to be separate properties is a statement that in order for separate grants made

at the same time conveying contiguous tracts to be considered a "single property," the primary terms of the leases must be the same.

Petitioners argue that the phrase, "separate interests," means interests which are variant in kind only and not in duration, citing *Hugh Hodges Drilling Co.*, 43 B.T.A. 1045 (1941).

Respondent's regulations defining interests (sec. 1.614-1(a)(2), Income Tax Regs.) present examples, all of which are qualitative and none of which refer to the term or duration of the interest. Respondent's regulations (sec. 1.614-1(a)(3), Income Tax Regs.) also state that there is a separate property in a single tract or parcel if the interests in it are "dissimilar." A difference in the number of years for which the leases are to be in effect does not cause those leases to be "dissimilar" for the period of time both are in effect.

Neither party has directed our attention, nor have we found, any case dealing with the precise problem here presented. However, cases involving other issues indicate that interests are considered to be separate, comprising separate properties when they are inherently different, *Herndon Drilling Co.*, 6 T.C. 628 (1946), but that interests are regarded as a single property when they are inherently alike and merely measured differently. See *Estate of O. W. Killam*, 33 T.C. 345 (1959).

In *Hugh Hodges Drilling Co., supra*, cited by petitioners, we stated that where a taxpayer had acquired an oil payment of $84,000 (out of three-fourths of the seven-eighths working interest) plus a vested three-eighths working interest, it had not acquired "two separate and distinct interests in each lease but acquired a single right measured by the two individual fractional interests." The *Hodges Drilling Co.* case dealt with the taxpayer's right to deduct drilling expenses which was dependent in part upon whether the taxpayer's interests were all economic interests in oil in place. The statement made by the Court when read in the context of the issue under consideration is not authority for the proposition that all economic interests in oil in place under a single tract constitute single interests. However, this case does show that similar interests may be treated as a single interest when application of other statutory provisions do not require that the two be treated separately.

In *Herndon Drilling Co., supra*, we held that a one-third leasehold interest plus a $50,000 oil payment right in the remaining two-thirds leasehold interest, simultaneously acquired, were separate properties because they were inherently different, one being a fee estate and one less than fee. In so holding we pointed out that the recovery of the taxpayer's capital expenditures in the fee interest was not limited to depletion allowances whereas it was so limited as to the in-oil payment. We

also referred to the difficulty of determining the "income from the property" if the two interests were treated as one property.

In *Estate of O. W. Killam, supra*, we held that a taxpayer who had retained, on the disposition of his leasehold estate, successive oil payments, one for $150,000 plus interest out of 75 percent of the working interest and the other for $200,000 plus interest out of 80 percent of the working interest, did not have two "separate" properties since the substance of the transaction was a transfer of a lease reserving a quantity of oil sufficient to pay the transferor $350,000. Although in the *Killam* case we considered the separation of the two "interests" as a "transparent" attempt to convert ordinary income into capital gain, we did discuss the taxpayer's contention as to "separate interests." If interests inherently alike do not create separate interests for purposes of applying other sections of the revenue laws, they should not be considered as creating separate interests or separate "properties" for the purpose of determining depletion issues.

These cases each look to the substance of the overall transaction as the final determinant of whether interests are dissimilar so that they should be considered as separate properties. Substantively, a lease for a primary term of 3 years is not dissimilar to one for a primary term of 7 years while both are in effect.

We conclude that the interests of petitioners in lease No. 2, lease No. 4, and lease No. 5 and their interest in the producing tracts of lease No. 1 are to be regarded as single interests under respondent's regulation, sec. 1.614–1, and inasmuch as those premises are all contiguous each petitioner's interest was a single property. Respondent was, therefore, in error in adding to petitioners' 1962 income an amount because of depletion previously taken by petitioners on bonus payments with respect to the tracts conveyed in lease No. 2 and lease No. 5.

Our conclusion that no amount should be included in petitioners' income because of depletion previously taken by petitioners with respect to the bonus payments on the acreage covered by lease No. 2 makes it unnecessary to discuss petitioners' argument that lease No. 2 has not expired because it was assigned to Mustang and partially extended by Mayer Halff.

Petitioners argue that under the decision in *Beaver Dam Coal Co.* v. *United States, supra,* the entire bonus received upon execution of the leases in 1955 ought to be allocated to the producing tracts. The Court held in the *Beaver Dam Coal Co.* case that a taxpayer who had to purchase more acreage than it needed in order to obtain surface rights necessary for coal strip-mining operations, was entitled to allocate the cost unevenly per acre in determining cost depletion basis. The Court said the taxpayer was permitted to allocate cost equitably and, where it had paid a premium, equitably did not mean evenly.

If the bonus received by petitioners in the instant case was not received ratably over the bonus acres covered, petitioners have failed to show such to be the fact. There is nothing in this record to indicate that one bonus acre leased should equitably have allocated to it a greater or lesser portion of the total bonus paid than another acre. Under other factual circumstances, an allocation on a bonus-acre basis might be shown to be inequitable, but this has not been shown in the instant case.

Respondent, in determining the deficiencies here in issue, allocated the bonus according to the bonus acres in each tract. Petitioners have the burden of proof and they have not shown respondent's allocation to be inequitable.

We sustain respondent's determination that depletion previously deducted by petitioners should be restored in the year 1962 in the amount as determined by respondent with respect to tracts IV, V, VIII, and IX of lease No. 1, but hold that no restoration of depletion should be made in 1962 with respect to the tracts conveyed under lease No. 2 and lease No. 5

Reviewed by the Court.

*Decisions will be entered under Rule 50.*